720 A.2d 1004

MONMOUTH COUNTY DIVISION OF SOCIAL SERVICES ON
BEHALF OF THE DIVISION OF YOUTH AND FAMILY
SERVICES, PLAINTIFF, v. C.R., DEFENDANT.

Superior Court of New Jersey
Chancery Division
Family Part
Monmouth County

Decided August 28, 1998.

*Thomas H. Klein,* for Monmouth County Division of Social Services (*Patrick J. Boyle* on the brief).

*Linda J. Robinson,* for Defendant (*Herbert D. Hinkle,* attorney; *Ms. Robinson,* on the brief).

HAYSER, J.T.C., temporarily assigned.

Emancipation of a child is reached when the fundamental dependent relationship between parent and child is concluded, the parent relinquishes the right to custody and is relieved of the burden of support and the child is no longer entitled to support . . .

[*Filippone v. Lee,* 304 *N.J.Super.* 301, 308, 700 *A.*2d 384 (App.Div.1997).]

The issue of emancipation, and the duty to provide continued or ongoing financial support and care to a child, are issues that have come before the courts in a variety of factual settings. In this matter, the issue presented is whether the biological parent of a disabled young adult may successfully terminate, retroactively, an agreement with the Division of Youth and Family Services (DYFS) for care and services, and its financial consequences, due to this son's earlier attaining the age of majority.

## FACTUAL BACKGROUND

Defendant and his wife are the biological parents of a twenty-one-year-old young adult, who previously has been diagnosed with Tourette's Syndrome, obsessive-compulsive disorder and schizophrenia. In 1991, due to their son's severe disabilities, a residential placement was recommended for him, and the parents requested the assistance of DYFS.

On January 29, 1992, the parents entered into a voluntary placement agreement with DYFS. Their son was then fourteen (14) years of age. The agreement provided, *inter alia,* that the parents retained their "parental rights and legal responsibilities for [their] child," and that they had "the right to terminate the

agreement and to ask for [their] child's return home at any time."[1] Furthermore, the parents entered into a financial agreement with DYFS, dated January 31, 1992, pursuant to *N.J.S.A.* 30:4C–1 through –83 whereby the parents, as "legally responsible person[s]," agreed to make payment for the child's care based upon their "income and resources."

Thereafter, on or about August 9, 1993, the Monmouth County Division of Social Services (MCDSS) filed a complaint in the Chancery Division, Family Part, on behalf of DYFS, to establish the parents' support obligation for the DYFS placement, pursuant to *N.J.S.A.* 9:17–38 through–59 and 30:4C–29.1. On or about November 23, 1993, defendant entered into a consent order which established his weekly child support obligation in the amount of $250.00, with an additional weekly amount of $100.00 payable against arrears, which were set at $20,750.00, dating back to January 1992.[2]

Prior to defendant's present motion, no application was ever made to terminate or modify either the support or financial agreement between the defendant and DYFS, or the later consent order.[3]

---

[1] Exceptions to the voluntary termination provision included the presence of a court order preventing termination and return of the child, or if DYFS obtained custody of the child pursuant to court order. Neither of these exceptions applies in this matter.

[2] The defendant alleges that he does not recall signing the agreements with DYFS. However, he acknowledges that his signature appears on those agreements. Moreover, the conduct of the defendant in honoring these agreements and performing under them belies any possible argument that agreement was not reached.

[3] At the time the support order was entered, the defendant's weekly gross income was $2,596.00, or approximately $135,000.00 gross annually, pursuant to his Child Support Obligation Worksheet dated November 19, 1993. His annual support obligation was $18,200.00, which initially included $5,200.00 payable annually against arrears.

It must be further noted that defendant's 1992 income of $135,000.00 is significantly greater than the average income for a family of three in this

The original placement of the child on January 29, 1992 was unsuccessful, and he was returned to his biological parents on April 10, 1992. Thereafter, DYFS placed him as a year-round residential student at the Devreaux School in Pennsylvania on May 11, 1992, where he remained until May 12, 1998, at which time the placement was terminated. The son turned twenty-one years old on June 26, 1998.

On April 24, 1998, the defendant filed a motion seeking retroactive termination of the order of "November 19(sic) 1993, due to his son's reaching his eighteenth birthday on June 26, 1995." In the absence of any further arrears balance, defendant requested that he be reimbursed by DYFS or MCDSS for any payments made after the date of the child's eighteenth birthday, since he "was no longer legally responsible for the costs of maintenance of [his son] incurred by the Division of Youth and Family Services ..." [4]

region. As late as 1997, the most recent numbers available, the median gross yearly income for a family of three is $53,086.00. *New Jersey Council on Affordable Housing, Annual Report* 1997. The court must consider this family to consist of three (3) members, because although there is an older male sibling, he is at least twenty-three years of age, has graduated from college, and is employed full-time.

Interestingly, proof has been submitted that in 1997, defendant had income of $1,616,814.80 for the fourth quarter alone, and total income in 1997 of no less than $1,707,294.80. N.J. Dept. of Labor, *N.J. Wage Reporting System.* Even taking the fourth quarter income as an aberration, defendant may still reasonably be attributed with average yearly income at this time of no less than $165,000.00.

[4] The costs of the child's residential placement for more than six years has been tremendous. For the period from January 29, 1992 through April 10, 1992 and the period from May 11, 1992 through May 12, 1998, costs have totaled $518,020.61. Of this amount, apparently, fifty percent (50%), or approximately $259,010.30, has been paid by Medicaid. Of the remaining $259,010.31, defendant has apparently contributed support pursuant to his consent order in the amount of at least $79,700.00– $41,750.00 (including fixed arrears of $20,750) due prior to his son's eighteenth birthday, and $37,500.00 due thereafter. In reality, defendant's fixed arrearage of $20,750.00, paid in the amount of $100.00 per week, was paid over 123.5 weeks, including 39.5 weeks after his son reached the age of majority. Defendant seeks the return of payments made by him after June 26, 1995 in the approximate range of $37,500.00 to $52,500.00, against

Defendant's argument is limited to the contention that DYFS cannot hold him financially liable for his son's care after June 26, 1995, because as of that date, his son was no longer a "child" entitled to support by a "legally responsible person" of a child as defined by *N.J.S.A.* 30:4C–2 and used in *N.J.S.A.* 30:4C–29.1. In other words, he contends that DYFS's "authority cannot be prolonged beyond that for which is statutorily provided." Defendant further argues that his payments were not for "support but rather contributions toward the residential costs."

Initially, two undisputed facts must be noted. First, the service and financial agreements between the parents and DYFS and the implementing court order have never previously been challenged as to either their validity or consensual nature. Even at this time, defendant seeks only the termination or vacation of the court order not because of any claimed fundamental invalidity, but rather due to its alleged "expiration," precipitated by the child's having achieved the age of majority. Secondly, it is undisputed that the parents never exercised earlier their unilateral right to terminate their voluntary service agreement with DYFS, and bring to a conclusion their financial obligation to support their child's care, as to which they now seek reimbursement.

## *THE DYFS STATUTORY FRAMEWORK*

■ Defendant initially relies upon the definition of a "child" set forth in *N.J.S.A.* 30:4C–2, and used in *N.J.S.A.* 30:4C–29.1, in alleging that his obligation is restricted, legally, to the period before the child in question attained the age of eighteen.

---

total governmental payments by DYFS from its own budgetary resources or other accessed funds in the amount of $179,310.30, which does not include the Medicaid payments. Interestingly, the defendant submits a DYFS document entitled "Case Plan Out–of–Home," dated September 10, 1997, indicating that he has been very satisfied with the services provided to his son, and indicating that he looks forward to continuing such services for an additional year. Defendant's Exhibit A at par. 5–6.

*N.J.S.A.* 30:4C–2(f) defines a "child" as ". . . any person under the age of 18 years." Paragraph (r) defines "legally responsible person" as ". . . the natural or adoptive parent, or the spouse of a child receiving maintenance from or through the Division of Youth and Family Services."

Relying upon these definitions, *N.J.S.A.* 30:4C–29.1 provides that a "legally responsible person" ". . . is liable to DYFS for the costs of maintenance of the child incurred by the Division," and that "nothing contained herein shall prevent the legally responsible person from voluntarily executing an agreement for payment to the division for the costs of maintenance of the child receiving care or custody when the child is in a foster home [or other placement]."

Defendant urges that these definitions and usage necessarily lead to the end of the parents' financial obligations, automatically upon the child's reaching the age of majority.

Statutory language and case law, however, belie defendant's position. *N.J.S.A.* 9:17B–2(f) provides that DYFS is permitted to continue services to dependent and/or neglected persons between the ages of eighteen and twenty-one "who are enrolled in a school or training program or who require a course of treatment for emotional, cognitive or physical disability." [5] Courts have recently relied on such language to authorize and condone DYFS's involvement, where appropriate, with young adults of these ages, even where the problems did not arise before they reached their majority. *See, for example, Matter of K.F.,* 313 *N.J.Super.* 319, 712 *A.*2d 1212 (App.Div.1998). The statutory mandate, as dis-

---

[5] This statute does provide, *inter alia,* that the individual's consent is to be given to extend DYFS's involvement beyond the age of eighteen (18). However, in this case, and indeed in all cases involving persons with severe emotional or cognitive disabilities, the individual is likely incompetent to give such consent, and his agent or guardian must so give. In this case, the defendant, as the child's parent, has by his words and acts given such consent, by entering the agreements with DYFS and failing to timely terminate those agreements. *N.J.S.A.* 9:17B–2 and –3.

cussed in this case, had nothing to do with the transition to adult services as defendant would argue as its purpose.[6]

■ Rules of statutory construction require statutes to be interpreted in *pari materia*, to give full affect to the legislative intent. *State v. Wean*, 86 *N.J.Super.* 283, 289–90, 206 *A.*2d 765 (App.Div. 1965); *Williams v. Bd. of Ed. Tp. of Deptford*, 192 *N.J.Super.* 31, 36–37, 469 *A.*2d 58 (App.Div.1983); *Milltown Industrial Sites v. Milltown Borough*, 12 *N.J.Tax* 581, 585 (1992). It cannot be seriously contested that the intent of *N.J.S.A.* 9:17B–2(f) is to extend, where necessary and appropriate, DYFS's authority and jurisdiction to address the needs of young persons who, despite having reached the age of majority, are still dependents and children, by conduct if not by definition.

■ It may be argued that equity must follow the law, and, indeed, this maxim is well established. *Dunkin' Donuts of America, Inc. v. Middletown Donut Corp.*, 100 *N.J.* 166, 183, 495 *A.*2d 66 (1985); *Seavey v. Long*, 303 *N.J.Super.* 153, 156–57, 696 *A.*2d 102 (App.Div.1997). However, any argument that "the law" is embodied in full in *N.J.S.A.* 30:4C–1 through –83, is belied and overcome by the clear intent of *N.J.S.A.* 9:17B–2(f), to extend DYFS's purview where appropriate. As such, "the law" which equity must follow consists of *all* these statutory provisions read in concert with each other. Furthermore, while equity may not disregard statutory law, it looks to its intent, rather than merely its form. *Sheridan v. Sheridan*, 247 *N.J.Super.* 552, 558–59, 589 *A.*2d 1067 (Ch.Div.1990).

The statutory framework under which DYFS operates to provide services to a child is, in many ways, similar to the parental obligations required to be met under *N.J.S.A.* 2A:34–23. Normally in each case, responsibility for the child may end at his

---

[6] Defendant's further argument that some agency would be required to provide such services ignores the discretion vested in this specific agency, DYFS, to continue to provide such services or terminate its involvement, based upon, *inter alia*, the possible continued financial participation of the defendant.

achieving the age of eighteen but depending upon the fact-sensitive circumstances of any given case, a continued support duty may be permitted or imposed, thus avoiding his "emancipation" under either a statutory or common law definition.[7]

## EQUITABLE CONSIDERATIONS

In addition to the statutory considerations above, equitable doctrines, including laches and equitable estoppel, come into play as a result of the defendant's various actions and inaction over the many years involved herein.

Initially, the court examines the doctrine of laches with regard to the defendant's actions-and inaction-as to this issue. Although the defendant urges that the eighteenth birthday of the child should have immediately given rise to the termination of his responsibility, that event occurred on June 26, 1995, some thirty-eight months ago, and no application has been filed seeking termination of his financial obligation until now.

---

[7] Defendant further argues that it is the Legislature that had provided that a parent's liability for such services automatically terminates upon the child's achieving his majority, but can it seriously be argued that under the facts, circumstances and equities of this case, the Legislature intended for the taxpayers to reimburse the defendant for consensual services rendered in good faith reliance? Such an absurd result cannot be assumed to be within the legislative intent. "The 'equity of the statute' rule does not, when properly applied, substitute the judicial for the legislative will, but rather in the consideration of all the material elements reaches the result probably intended by the draftsman had he anticipated the situation at hand. Indeed, to hold otherwise in the absence of considerations clearly requiring such a contrary construction, is to claim for the judiciary a monopoly on the ability to perceive the justice of a cause." *Dvorkin v. Dover Tp.*, 29 *N.J.* 303, 315, 148 *A.2d* 793 (1959). "Statutes are to be read sensibly rather than literally ... When a literal reading of the statute leads to 'absurd consequences,' the court must 'restrain the words' and 'seek the true legislative intent.'" *Nat'l Westminster Bank v. Anders Engineering, Inc.*, 289 *N.J.Super.* 602, 609, 674 *A.2d* 638 (App.Div.1996). It is a general principle of statutory construction that "statutes are to be read sensibly rather than literally and the controlling legislative intent is to be presumed as 'consonant to reason and good discretion.'" *Parker v. Esposito*, 291 *N.J.Super.* 560, 566, 677 *A.2d* 1159 (App.Div.1996); *see also Essex Crane Rental Corp. v. Director, Div. on Civil Rights*, 294 *N.J.Super.* 101, 682 *A.2d* 750 (App.Div.1996).

As such, beyond any statutory argument as to the payment of the child's costs, DYFS could reasonably have understood that the agreement remained in full force, and defendant's intent was that it continue pursuant to *N.J.S.A.* 9:17B–2(f), in the absence of any application to the contrary by the defendant. Laches is defined by the courts as the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to act in one's legal interests. *State, DEPE v. Dopp,* 268 *N.J.Super.* 165, 632 *A.*2d 1270 (App.Div.1993). Laches occurs when this unreasonable delay results, or would otherwise result, in a prejudice to the other party. *Matter of Adoption of a Child of Indian Heritage,* 111 *N.J.* 155, 543 *A.*2d 925 (1988).

In this matter, clearly DYFS, and ultimately the taxpayers, for who DYFS is in all reality an agent, have reasonably maintained the arrangement reached with defendant over the past three years, as authorized under the above-cited statutes and case law, and as implied by the parties' actions. As such, defendant's present claim, based upon an alleged per se interpretation of an event occurring over three years ago, is exactly the type of claim which equity intends to be barred by the doctrine of laches.

The same argument applies from the opposite side. Just as defendant's inaction gives rise to the equitable protection of laches, DYFS's action gives rise to an equitable estoppel argument. Where one party reasonably relies upon the actions of another, and thereby changes its position in reliance, incurring actual damages as a result, equity will protect that party's interests. *Royal Assoc. v. Concannon,* 200 *N.J.Super.* 84, 490 *A.*2d 357 (App.Div.1985). The doctrine of estoppel is founded on fundamental principles of justice and good conscience. *O'Malley v. Dept. of Energy,* 212 *N.J.Super.* 114, 514 *A.*2d 69 (App.Div.1986), *certif. gr.* 107 *N.J.* 34, 526 *A.*2d 127, *rev'd on other grounds,* 109 *N.J.* 309, 537 *A.*2d 647 (1987).

In the case at bar, had the defendant indicated to DYFS that he wished to terminate the agreement upon or at any time after the child's eighteenth birthday, surely DYFS could have, and would

have, made arrangements to return the child to his parents, thereby ending the ever-increasing costs of his care, to defendant, DYFS, and the various agencies who subsidized that arrangement. However, no such indication was given. The payment arrangement ostensibly remained in place, as defendant continued to make his payments, through May 1998. As such, DYFS did not act to return the child, relying on defendant's inaction—especially in light of defendant's sole option to terminate the agreement at any time—and reasonably understood that the agreement remained in place until the May 1998 return of the child to defendant.[8] This fact pattern surely gives rise to an equitable estoppel against any post-hoc application for retroactive termination of an agreement which the parties' actions indicated was still in full force.

Finally, even a void court order would require a timely challenge to avoid estoppel and laches. *R.* 4:50–2; *United Pacific Ins. Co. v. Lamanna's Estate,* 181 *N.J.Super.* 149, 166, 436 *A.*2d 965 (Law Div.1981). Where a party fails to seek relief in a reasonable time and thereby prejudices the rights of another party or innocent third party, no relief will be granted under *R.* 4:50–2. *City of Newark v. Block 1854,* 244 *N.J.Super.* 402, 407–08, 582 *A.*2d 1006 (App.Div.1990).

Beyond these basic tenets of equity, the issue of inadvertent taxpayer subrogation must be addressed. The principle inquiry is if, in fact, DYFS exceeded its statutory authority to require continued support from the parents, did it not then also do a disservice to the taxpayers, who improperly paid for most of the services' expenses, and should the defendant now be required to reimburse the taxpayers? *Monmouth County Div. of Social*

---

[8] Actually, in the absence of the defendant having entered into an alternative placement plan for the young man now age twenty-one, his placement has apparently continued at Devreaux, with the financial responsibility now borne entirely by the defendant. Whether this turn of events has occasioned the present motion need not be speculated upon.

*Services for D.M., n/k/a D.W. v. G.D.M.*, 308 *N.J.Super.* 83, 705 *A.*2d 408 (Ch.Div.1997).

In this case and those of its nature, an ostensibly private agreement stands to have significant ramifications in the public forum. Specifically, the taxpayers have already paid, directly, significant maintenance costs for this child, as noted in note 4, *supra.* Furthermore, were the defendant to succeed in his instant motion, an even larger percentage of the acknowledged $518,-000.00 in residential expenses would fall upon the taxpayers.

Where possible, the taxpayers must be protected from bearing the burden of a debt owed and payable by a private individual. *N.J.S.A* . 44:10–2, par. 2; *Baylor v. New Jersey Department of Human Services, Division of Public Welfare*, 235 *N.J.Super.* 22, 561 *A.*2d 618 (App.Div.1989), aff'd. 127 *N.J.* 286, 604 *A.*2d 110 (1990); 42 *U.S.C.A.* § 601– § 687 (Social Security Administration). This policy is embodied not only in the provisions of Title 44, but in many other areas of New Jersey law. See, *e.g., N.J.S.A.* 5:9–13.5, requiring that any owed child support arrears and any amounts owed to public assistance are paid prior to the disbursement of state lottery winnings. In general, the Legislature intends to assure adequate and enforceable support orders for dependents, and to avert the need for public maintenance. *State v. Monroe*, 30 *N.J.* 160, 152 *A.*2d 362 (1959). Public assistance is to be a measure of last resort. To that end, the Legislature has provided a mechanism to enforce support payments. *N.J.S.A.* 2C:24–5; *State v. Savastini*, 14 *N.J.* 507, 516, 103 *A.*2d 249 (1954). Other jurisdictions similarly require parents to reimburse public assistance agencies when possible. See, *e.g., In Re Simmons*, 72 *Cal.App.*3d 205, 139 *Cal.Rptr.* 832 (1977); 79 *Am.Jur.*2d Welfare Laws § 91 (1975 & Supp).

■ It is no great leap in logic to apply this policy to cases such as the present one. Just as the Legislature has taken steps to recoup unpaid child support to protect the taxpayers from non-paying obligors, so too must we protect the taxpayers from unwittingly subrogating private contracts, which would be the

result were the last three years of the agreement herein to be terminated retroactively. "Any constitutional right of a juvenile to treatment for a mental disorder does not include the right to publicly-financed treatment in one of the most costly facilities available," or at considerable public expense. *State in Interest of D.F.*, 145 *N.J.Super.* 381, 391, 367 *A.2d* 1198 (App.Div.1976). As with "typical" child support cases, those matters involving mental health issues do not give rise to a public subrogation of a party's obligations, especially where the obligation is taken on voluntarily.[9]

Other jurisdictions have faced similar circumstances. In *Department of Social Services v. Caro*, 410 *N.Y.S.2d* 360, 65 *A.D.2d* 811 (1978), the plaintiff was receiving public assistance and assigned her support rights to the Department. In the subsequent evaluation of the changed circumstances, the New York Appellate Division sought, for policy reasons, to shift as much of the support burden from the taxpayers to the appellant as possible. Acting under New York's Family Court Act, § 571, the court was required to hold the public harmless from this private debt as much as possible. *Id.* at 812, 410 *N.Y.S.2d* at 361.

In light of the above, it is clear that the State, and ultimately the taxpayers, are not to be left "holding the bag" when private parties contract themselves out of basic familial obligations. However, this is essentially the situation which defendant seeks in this matter. As such, the court is satisfied that no retroactive adjustment in the defendant's obligations is equitable, in light of the public interests involved and under the facts of this case.

### THE NATURE OF EMANCIPATION

Children who are unable to care for themselves because of their minority are no less entitled to the court's solicitude when they continue to suffer, after they have

---

[9] Defendant's further contention that some public agency, in any event, must meet the special needs of this specially challenged young man begs the point that any agency need provide only the required quantity and quality of services and not necessarily those provided voluntarily by DYFS in reliance upon, in part, the defendant's role.

attained their majority, from a physical or mental disability which continues to render them incapable of self-support. Normal instincts of humanity and plain common sense would seem to dictate that in such cases the statutory obligation of the parent should not automatically terminate [at age eighteen], but should continue until the need no longer exists . . .

*Kruvant v. Kruvant,* 100 *N.J.Super.* 107, 119–20, 241 *A.*2d 259 (App.Div.1968) [citations omitted].10

The defendant seems to equate the child's reaching the age of eighteen with emancipation *per se.* This argument is implicit, at least, in his statutory argument as to the end of DYFS's authority and his duty to financially participate in meeting his son's care needs for services by DYFS once the child reached his majority. However, New Jersey courts have uniformly rejected such a hard-line, objective rule as to emancipation.

There are a number of additional flaws in defendant's present argument. Clearly, under their voluntary agreement with DYFS, the parents acknowledged the maintenance of their fundamental custody of their child and their ongoing, and also fundamental, duty to provide financial support. As to their rights and responsi-bilities, their agreement with DYFS changed nothing. Their parental rights have not been terminated, *N.J.S.A.* 9:2–16, 17; *N.J.S.A.* 9:3–41; *N.J.S.A.* 30:4C–23, nor have they voluntarily surrendered their rights. Indeed, their child has been effectively reunited with the parents, before he reached age twenty-one.

Defendant argues that his payment for the requested residential placement of his child due to health necessity is some type of "contribution," but not "support." The premise apparently is that such payments imply no duty, but rather just a form of voluntary kindness. This argument ignores both the consent order entered

---

10 In this matter, the court need not reach the limits, if any, of the *Kruvant* holding, which seems to indicate that the parent(s) of a disabled, and thereby totally dependant, child, may have an ongoing support obligation to that child, not just to the age of majority, not just through the age of twenty-one, but indeed for life, or as long as that child is dependent, and thereby, under the various definitions offered, clearly not "emancipated."

and the provisions of the statutes cited therein. *N.J.S.A.* 30:4C–29.1, *N.J.S.A.* 9:17–38 *et seq.*

■ Furthermore, defendant's position seems to ignore the basic support obligation of every parent to his child, which transcends any temporary source used to help meet this obligation. New Jersey courts have long held that a parent is bound to provide a child with necessities, including the meeting of the child's health needs. *See Tomkins v. Tomkins,* 11 *N.J.Eq.* 512, 517–18 (Ch.1858); *Kopack v. Polzer,* 5 *N.J.Super.* 114, 117, 68 *A.*2d 484 (App.Div.1949), aff'd. 4 *N.J.* 327, 328, 72 *A.*2d 869 (1950); *Grotsky v. Grotsky,* 58 *N.J.* 354, 356–57, 277 *A.*2d 535 (1971); *Ionno v. Ionno,* 148 *N.J.Super.* 259, 261, 372 *A.*2d 624 (App.Div. 1977); *Lynn v. Lynn,* 165 *N.J.Super.* 328, 342–43, 398 *A.*2d 141 (App.Div.), *certif. denied* 81 *N.J.* 52, 404 *A.*2d 1152 (1979). Today, "[a]s a general rule, a parent is obliged to contribute to the basic support needs of an unemancipated child to the extent of the parent's financial ability." *Martinetti v. Hickman,* 261 *N.J.Super.* 508, 513, 619 *A.*2d 599 (App.Div.1993). *Monmouth County Div. of Social Svc. For D.M., n/k/a D.W. v. G.D.M., supra,* 308 *N.J.Super.* at 86–89, 705 *A.*2d 408.

Other jurisdictions similarly recognize the fundamental duty of every parent to support their children to the degree possible. *Van Valkinburgh v. Watson,* 13 *Johns., N.Y.* 480, 7 *Am.Dec.* 395 (Sup.Ct.1916); *Dee v. Dee,* 169 *N.Y.S.*2d 789, 792–93, 9 *Misc.*2d 964, 967 (1957) ("It is every child's birthright to be sustained and supported according to the means and station in life of his father."); *State of Connecticut v. Boyd,* 4 *Conn.Cir.Ct.* 544, 548, 236 *A.*2d 476, 478 (1967) ("The duty of a father to support his minor children is one of the most fundamental duties and obligations of life."); *In re Kristina L.,* 520 *A.*2d 574, 579 (R.I.1987); *Blue v. Blue,* 532 *Pa.* 521, 529, 616 *A.*2d 628, 632 (1992); *In re Bruce R.,* 234 *Conn.* 194, 202–03, 662 *A.*2d 107, 112 (1995); *Wills v. Jones,* 340 *Md.* 480, 667 *A.*2d 331 (Md.App.1995) ("This Court has repeatedly recognized, one of the most fundamental duties of parenthood is 'the obligation of the parent to support the child

until the law determines that he is able to care for himself,'"
quoting *Carroll County v. Edelmann*, 320 *Md.* 150, 170, 577 *A.*2d
14 (1990)).

■ The issue of emancipation is closely related to the ongoing
obligation of parents to support their children. The support
obligation of parents as to their adult children has been addressed
by the courts over the years. Generally, parents are not under a
duty to support children after the age of majority is reached.
*Newburgh v. Arrigo*, 88 *N.J.* 529, 443 *A.*2d 1031 (1982); *N.J.S.A.*
9:17B–3.

■ However, this so-called general rule has been subjected to
many exceptions over the years. It is clearly established that
emancipation is a fact-sensitive event, dependent upon the intrica-
cies and various operative facts of each matter. *Newburgh v.
Arrigo, supra,* at 543, 443 *A.*2d 1031; *Baldino v. Baldino,* 241
*N.J.Super.* 414, 418, 575 *A.*2d 66 (Ch.Div.1990); *Bishop v. Bishop,*
287 *N.J.Super.* 593, 597–99, 671 *A.*2d 644 (Ch.1995); *Kruvant v.
Kruvant, supra,* 100 *N.J.Super.* 107, 241 *A.*2d 259 (App.Div.1968).

Beyond this general premise, one major specific exception to the
rule deals with the ongoing support obligation of parents whose
children, although beyond the age of majority, remain enrolled in
full-time higher education. *Filippone v. Lee,* 304 *N.J.Super.* 301,
700 *A.*2d 384 (1997); *Weitzman v. Weitzman,* 228 *N.J.Super.* 346,
549 *A.*2d 888 (App.Div.1988).

■ The present situation is similar to the well-established
educational exception to emancipation. First, the statutory lan-
guage and intent of *N.J.S.A.* 9:17B–2(f), as discussed above,
indicates that where a situation demands the involvement of
DYFS—as this situation does—DYFS's involvement may extend
beyond the "normal" emancipation age of eighteen, to twenty-one,
where the facts of the case so merit.

Likewise, courts have held that where the circumstances merit,
disability, like continuing education, may extend the time in which
a child is deemed unemancipated, notwithstanding his reaching the

age of majority. In *Kruvant,* the court required the defendant to provide support for a child who, despite having reached the age of majority, was "so disabled as to be incapable of maintaining himself because of a mental illness or emotional disorder which pre-existed his attaining his majority." *Kruvant, supra,* 100 *N.J.Super.* at 118, 241 *A.2d* 259 (*citing Wells v. Wells,* 227 *N.C.* 614, 44 *S.E.2d* 31, 1 *A.L.R.2d* 905 (1947)).

 "The principle that an infant on reaching the age of [majority] becomes a *sui generis* person and therefore no longer a child does not automatically apply to persons who are under a natural disability such as an incompetent . . ." *Johnson v. State,* 18 *N.J.* 422, 431, 114 *A.2d* 1, *cert. den.,* 350 *U.S.* 942, 76 *S.Ct.* 318, 100 *L.Ed.* 822 (1956).

Other jurisdictions have similarly required parents to continue to support their "adult" children who are, for reasons of mental, physical or emotional disability, unable to become independent and "emancipated." *See, Breuer v. Dowden,* 207 *Ky.* 12, 268 *S.W.* 541 (Ct.App.1925); *Halsted v. Halsted,* 228 *A.D.* 298, 239 *N.Y.S.* 422 (1930); *Siravo v. Siravo,* 424 *A.2d* 1047 (R.I.1981); *Hanson v. Hanson,* 425 *Pa.Super.* 508, 625 *A.2d* 1212 (Pa.Super.1993).

 In sum, clearly a child who reaches the age of majority is not "automatically" emancipated. The court is required to examine the facts of each case to determine if, under applicable law, the "fundamental dependent relationship between parent and child is concluded." *Filippone v. Lee, supra,* 304 *N.J.Super.* at 308, 700 *A.2d* 384.

 In this matter, in light of the serious emotional and mental difficulties being faced by the child, the court is satisfied that applicable law precludes a finding that he is emancipated, even in the limited sense of the defendant's financial role in meeting the obvious health needs. Defendant's limited, but voluntary, financial involvement in meeting his son's needs is really the affirmation of what was always his fundamental duty, even in the

presence of a concurrent role required or permitted of public authorities.

### *CONCLUSION*

It may be argued that the very nature of this application, under the facts existing, should "shock the conscience of equity." *Matter of Quinlan,* 137 *N.J.Super.* 227, 255–57, 348 *A.*2d 801 (Ch.1975), *certif. gr.,* 69 *N.J.* 399, 354 *A.*2d 326, *modified on other grounds,* 70 *N.J.* 10, 355 *A.*2d 647 (1976); *Phillips v. Pullen,* 45 *N.J.Eq.* 5, 8, 16 *A.* 9 (1888).

In this matter, the defendant, an individual not of modest means or accomplishment in 1992, sought the assistance of DYFS for his undisputedly challenged child. DYFS responded, and services were provided at considerable public expense. Defendant was not required to reimburse public sources for this care provided, but only to pay his share based upon his means and ability to pay, as the law permitted.

The nature, quantity or quality of the services provided has apparently never been challenged. Defendant's financial obligation towards the services rendered has never been increased, despite his change in financial fortunes. Defendant always maintained his rights and responsibilities as to custody of his child and the need to provide financially for his needs. Furthermore, he at all times maintained the right to terminate his voluntary agreement with DYFS, and bring to an end his financial participation in that service arrangement. DYFS has always honored and performed under the agreement based upon the defendant's voluntary and continued participation.

Now defendant seeks not simply to terminate the placement agreement, but to do so retroactively, having not only received the benefits of the agreement, but as a practical matter, requiring the taxpayers to further expend public funds to, as he argues, make him whole for what he paid since June 26, 1995. The sole basis for this claim offered by the defendant is the

tenuous argument that statutorily, if DYFS wanted to continue to service his son, DYFS must travel that road alone. He maintains this position, despite his—and not any public authority's—ongoing duty to meet the needs of this challenged young adult. "[C]ourts of equity have reflected the collective public conscience of what should and should not be done. Equity involves the obedience to dictates of morality and conscience." *Sheridan, supra,* 247 *N.J.Super.* at 558–59, 589 *A.*2d 1067. "Equity will do that what in good conscience ought to be done." *Carroll v. DeMartini,* 19 *N.J.Super.* 136, 88 *A.*2d 26 (Ch.Div.1952).

Finally, the court would note that it is not the individual opinion of this court, but the contemporary mores and conscience of society, which dictate, in the final analysis, the equitable resolution of this matter. "The morality of which equity speaks is that of society and not the judge's personal view of right and wrong." *Sheridan, supra,* 247 *N.J.Super.* at 559, 589 *A.*2d 1067.

For the reasons stated herein, the court is satisfied that equity, statute and case law alike preclude the defendant in this matter from receiving any reimbursement from DYFS or MCDSS for the three year period between the child's eighteenth birthday and the termination of the agreements in May 1998.

Therefore, defendant's motion is denied, and no retroactive termination of the agreements and implementing consent order is ordered.[11]

---

[11] Effective with the actual termination of the agreement, and *de facto* suspension of the implementing financial order, as of May 12, 1998, defendant is entitled to a credit for any actual overpayment made beyond his total of regular weekly payments at $250.00 per week and the initial arrearage of $20,750.00, paid at $100.00 per week.