# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2421-17T2
                A-2424-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

       Plaintiff-Respondent,

v.

Y.R. and J.D.R.,

       Defendants-Appellants.

_____

THE MATTER OF THE
GUARDIANSHIP OF J.R.,

       a Minor.

_____

Submitted May 15, 2019 – Decided June 10, 2019

Before Judges Alvarez and Reisner.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FG-12-0063-17.

Joseph E. Krakora, Public Defender, attorney for appellant Y.R. (Andrew Robert Burroughs, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant J.D.R. (John Andrew Albright, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Joshua Paul Bohn, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory Hadley Cassar, Designated Counsel, on the brief).

PER CURIAM

Defendants Y.R. (Mary),[1] the child's mother, and J.D.R. (Tom), the child's father, appeal from a January 10, 2018 order terminating their parental rights to their son, J.R. (Sam), who was approximately seventeen years old during the time of trial. Sam was born with severe physical and cognitive disabilities, which will prevent him from living independently. He is currently in a specialized resource home, is maintaining his weight after a three-year dramatic failure to thrive documented in the medical records introduced by the Division of Child Protection and Permanency (Division) at trial, his epilepsy has

---

[1] We employ pseudonyms when referring to the parties to protect their privacy.

improved, and his cognitive skills, albeit limited, are improving. We affirm termination, substantially for the reasons stated by Judge Michael J. Nelson in his twenty-page written decision issued the same date as the judgment. His factual findings are fully supported by the evidence, as is his assessment of witness credibility, and the weight he accorded expert testimony. Based on those findings, his legal conclusion that the Division had met all four prongs of the statutory test for termination of parental rights by clear and convincing evidence warrants affirmance.

## I.

We summarize the extensive record of pretrial proceedings and seven days of trial testimony. The Division became involved with the family in 2004, when their now-emancipated three older children lived at home. Those contacts initially involved only the older children, not Sam. By 2011, however, the Division had also become involved in Sam's care, providing services to the family, including a referral to the Division of Developmental Disabilities and the suggestion of a school setting better suited to Sam's needs. In December 2012, the Division obtained an order granting the agency care and supervision for Sam, while physical custody remained with defendants.

Beginning in approximately 2014, Sam's weight dropped to dangerous levels, the fourth percentile for a child his age and height. Lab work conducted during one of his several hospitalizations indicated that his seizure medication was significantly below therapeutic range. The Division continued to extend services, and ultimately closed its file when Mary agreed to be responsible for Sam's medical care and to take him to medical appointments. Tom did not engage with caseworkers.

Thereafter, caseworkers learned that Mary was locking Sam in his bedroom after school until the following morning, she claimed for his own protection. When in the summer of 2015 Sam was admitted to the hospital for three weeks, at age fifteen, he weighed seventy pounds. The Division learned then that Sam was actually capable of eating a far greater range of foods than Mary claimed. School records for that time period indicate that Sam would on occasion steal food from other students and take food out of the garbage.

When hospitalized in 2015, testing on Sam's blood levels established that his seizure medication was again far below therapeutic levels. During his three-week hospital stay, Sam gained twenty-eight pounds, regained his ability to walk, and his seizures eased slightly. The hospital physician who provided care concluded that Sam was being physically neglected and emotionally abused—

4

not just because of his dangerous weight loss and the fact he had not been given his medication—but also because of the family's practice of locking him in his bedroom after school.

Caseworker notes from that summer indicate that when asked about Mary's practice, Tom acknowledged that Mary kept Sam locked in his bedroom but said he did not know why. He also insisted that Mary was the only person who administered Sam's seizure medications, and that he believed she did so. Accordingly, the Division conducted an emergency removal.[2] When served written notice regarding the court date after the removal, Tom responded: "I can't go to court on the 18th because of my job. Can you reschedule for the week of the 31st?"

Sam lived in a residential setting from August 2015 to May 2016. During that time, his condition much improved, although ultimately, he was asked to leave the facility because of an incident during which he attacked staff. It bears mention that during this residential placement, it was learned that Sam was higher functioning than Mary reported. He was not blind, not deaf, could

---

[2] A "Dodd removal" is an emergency removal without court order or consent of a parent or guardian, New Jersey Division of Youth & Family Services v. P.W.R., 205 N.J. 17, 26 n.11 (2011), where "continuance in . . . the care and custody of the parent or guardian presents an imminent danger to the child's life, safety, or health." N.J.S.A. 9:6-8.29(a).

communicate albeit in a limited fashion, sit unassisted, and eat. Sam was placed with a resource family in July 2016. At the time, Sam weighed 150 pounds, as compared with 70 pounds a year earlier.

Both parents began to visit commencing in August 2016, although the issues that had been documented earlier continued. Tom and Mary had difficulty feeding Sam, keeping him clean, and administering his seizure medication. Tom knew that Sam suffered from seizures, but was unaware that his son had been diagnosed with an epilepsy disorder until several months before the guardianship hearing began.

The Division's bonding expert opined the child's psychological parents were the resource family. They are willing to adopt him. The Division also presented testimony from a parental capacity expert, who concluded that termination was the only alternative because Mary viewed herself as having done nothing wrong, and complained that after ten years of services, the Division had done nothing to help her.

Even Tom's expert, who did not recommend immediate reunification, acknowledged that returning Sam to Tom's care would require supportive services. Tom's expressed plan, were custody to be placed with him, was for Mary to continue to care for Sam during the day. If she were unavailable, he

A-2421-17T2

planned to obtain assistance from a suitable agency because he intended to continue to work.

Although there is an attachment between the parents and their child, the Division's experts found a disconnect between Mary and Sam, more so than Sam and his father. Mary had little tolerance or appreciation of Sam's needs. Tom is affectionate with his child, but he has never administered his medications, and he has little understanding of the level of care he requires.

The judge found that the Division had proven all four prongs by clear and convincing evidence as to both parents. See N.J.S.A. 30:4C-15.1(a). With regard to prong one, the judge found that Sam "was subjected to medical neglect due to the lack of adequate feeding and the lack of proper anti-seizure medication, and emotional abuse due to the child being locked in his room and isolated from his family." Mary had been repeatedly instructed regarding Sam's seizure medication but failed to administer it while insisting she did so. Obviously, Tom

> failed to protect [Sam] from . . . prolonged failure to thrive. No one intervened regarding [Sam] being locked in his room, ensuring that he was adequately fed and ensuring that he was adequately medicated when his seizure activity increased. [Tom] testified on his own behalf that he attempted to feed [Sam] pudding, but sometimes he would not eat it and he did not know what to do.

7

With regard to prong two, the judge found that Tom would rely on Mary, despite the fact Tom "confirmed his wife stopped giving [Sam] his medication." Tom could not answer questions regarding the child's physical needs and his medication requirements. Tom merely insisted he was not responsible for his son's weight loss, denying any responsibility for Sam's failure to thrive even though Tom lived in the home at the relevant time. The judge also noted that, except for individual counseling, Tom did not follow even the recommendations his own expert made that could have led to reunification. While Mary simply did not "appreciate her son's medical needs[,]" Tom was simply "unreasonable" in his failure to adequately plan for Sam's care if the child returned to his custody.

Overall, the parents were therefore simply unable or unwilling to "correct the circumstances that led to the removal of their son." Since delay in permanent placement would harm the child, and Tom and Mary cannot provide him with a safe and stable home, prong two was satisfied.

With regard to prong three, the judge reviewed the extensive services the Division provided to the parents, the fact they received transportation assistance, including bus and train passes, but were unable to benefit from any services. Their failure to modify their behavior so they could provide their child with a

8

safe and nurturing environment was not the result of any failure on the part of the Division.

With regard to the final prong, whether termination would do more harm than good, the judge observed all the experts acknowledged that Tom and Mary at present lacked the capacity to parent Sam. As he said, "they are not likely to become viable parenting options, or viable permanency options, in the foreseeable future." Sam "is thriving in his resource home and he is happy and secure there." Given that his parents cannot minimally feed and medicate him, much less provide a nurturing environment, the judge opined that Sam's best interests were to remain in the resource home where he had lived and significantly improved for two years. Termination would not do more harm than good.

## II.

On this appeal, Tom presents the following points:

> I. TERMINATION OF THE FATHER'S PARENTAL RIGHTS TO HIS NOW ADULT SON WAS ERROR AND POINTLESS UNDER PRONG FOUR OF THE STATUTORY TEST, AS DCPP DOES NOT HAVE THE AUTHORITY TO CONSENT TO ADULT ADOPTIONS, LEAVING NO DISCERNABLE COMPENSATING BENEFIT.

9

A. There is no possibility [Sam] will be adopted because he is no longer a minor and DCPP lacks the authority to consent to his adoption by others, therefore, there is no compensating benefit to the termination of parental rights, which will do more harm than good.

II. THE LOWER COURT DID NOT CONSIDER ALTERNATIVES TO TERMINATION OF PARENTAL RIGHTS TO SATISFY PRONG THREE: THE CARE [SAM] NEEDS DID NOT REQUIRE TERMINATION OF HIS FATHER'S PARENTAL RIGHTS – [SAM] NEEDED DDD SERVICES.

III. IN THE CASE OF EIGHTEEN YEAR OLD [SAM], WHO SUFFERS FROM CEREBRAL PALSY AND OTHER SERIOUS CONDITIONS, THERE IS NO EVIDENCE IN THE RECORD TO SUPPORT THE PRONG TWO REQUIREMENT THAT A DELAY IN "PERMANENT" PLACEMENT WILL HARM HIM, OR THAT SEPARATION FROM FOSTER CARE WILL CAUSE SEVERE AND ENDURING HARM.

A. It is beyond the scope of DCPP's statutory mandate to establish "permanency" for a severely disabled adult by terminating parental rights, and [Sam] does not require any such permanency in the form of adoptive foster care.

B. The second prong is also unsatisfied because DCPP did not meet its burden to prove that separating [Sam] from his foster

parent would cause severe and enduring harm.

IV.     [TOM] DID NOT INFLICT ANY HARM ON [SAM], WHO IS NOW AN ADULT SUFFERING FROM CEREBRAL PALSY AND OTHER SERIOUS CONDITIONS, IN LEAVING HIM IN HIS MOTHER'S CARE WHILE HE WORKED FULL-TIME FOR THIRTY YEARS TO SUPPORT THE FAMILY.

    A.     The trial judge's naked prong one conclusion as to [Tom] is not tethered to any recitation of facts, law and reasoning and explanation.

    B.     The trial judge's bald conclusion [Tom] somehow harmed [Sam] is unsupported by the record and directly contrary to [another judge's] conclusion he did not abuse or neglect [Sam].

On this appeal, Mary presents the following points:

AS THE STATE FAILED TO PROVE ALL FOUR PRONGS UNDER N.J.S.A. 30:4C-15.1(a), THE TRIAL COURT WAS WRONG WHEN IT TERMINATED [MARY'S] PARENTAL RIGHTS TO HER SON.

(1) As the trial court failed to consider whether [Sam]'s dramatic change of behavior in 2015 was the contributing cause of his weight loss, despite [Mary's] efforts to seek treatment for her son, it erred when it found the State satisfied its burden under prong one.

11

(2)    As the trial court failed to consider [Mary]'s efforts to alleviate her son's medical condition, it erred in finding the State had satisfied prong two.

(3)    Because DCPP failed to provide services tailored to a family attempting to meet the needs of an autistic child, the trial court erred in finding the State had satisfied prong three.

(4)    As the trial court failed to seriously consider whether gradual reunification was feasible, it erred in finding prong four was satisfied.

### III.

Our review of the Family Part judge's decision in a guardianship case is limited. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014). "[T]he trial court's factual findings should be upheld when supported by adequate, substantial, and credible evidence." Ibid. We accord deference to factual findings of the Family Part given its "superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012). We do not overturn a family court's findings unless they are "so wide of the mark that the judge was clearly mistaken." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007). Our decision to initiate termination of parental rights is guided by analysis of the following:

(1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a)(1)-(4).]

We will discuss each prong in turn.

A.

We consider Tom and Mary's arguments related to prong one to be so lacking in merit as to not warrant much discussion in a written decision. See R. 2:11-3(e)(1)(E). The Division presented ample proofs during the trial and at pretrial hearings that they physically and emotionally neglected their child, who suffered from life-threatening failure to thrive. Despite their protestations that

13

A-2421-17T2

circumstances beyond their control were responsible for Sam's malnutrition and repeated prolonged and unnecessary seizures, ultimately the responsibility for his care rested with them. They clearly did not fulfill those responsibilities.

By clear and convincing evidence, the Division proved the parents were responsible for Sam's physically vulnerable condition, despite services, and that neither parent understood the role he or she played in his deteriorating state, or how to care for him in a manner that would avoid a recurrence. The Division proved that Sam's safety, health, or development has been or will continue to be endangered by the parental relationship.

B.

With regard to prong two, nothing that we have seen in this record indicates it is reasonably foreseeable that the parents will not inflict harm upon Sam if he were returned to their care. Tom's plan for reunification is not different from the circumstances which led to Sam's failure to thrive, and emotional and physical neglect. He has never administered his epileptic child's medication and does not know what to do when he does not eat.

Mary, on the other hand, insists she gave the child his medication, despite blood test results to the contrary. Her description of his condition was grossly inaccurate. It amounted to a self-serving view of Sam that justified isolating

14

him in a locked bedroom. Thus, the Division has by clear and convincing evidence established that neither parent was willing or able to provide Sam with a safe home.

C.

Over the course of thirteen years, the Division provided this family with multiple services consistent with the requirements of prong three. The child's failure to thrive actually evolved while the Division was attempting to provide services to the family. Short of taking custody of the child, which may have saved his life, the Division could not have done more than it attempted to do in this case. These arguments are so lacking in merit as to not warrant further discussion. See R. 2:11-3(e)(1)(E).

D.

Finally, both parents claim that under prong four, the Division has not proven by clear and convincing evidence that terminating their parental rights will not do more harm than good. This child has a bond with his parents, but they are woefully unable to recognize, much less provide for, his extreme physical, medical, and emotional requirements. Thus, this prong was also met.

Tom's contention that there is no possibility that Sam will be adopted, and therefore no corresponding benefit to termination of parental rights, is mistaken.

A-2421-17T2

The statute defines a "child" to include a person with Sam's disabilities. The Division can in fact provide "services pursuant to the laws relating to dependent and neglected children . . . to persons between [eighteen] and [twenty-one] years of age who seek to avail themselves of such services and . . . who require a course of treatment for emotionally, cognitively or physically disabled persons." N.J.S.A. 9:17B-2(f) (emphasis added). The Division can continue to provide services even after Sam turns eighteen years of age. See In re K.F., 313 N.J. Super. 319, 324 (App. Div. 1998); Monmouth Cty. Div. of Soc. Servs. v. C.R., 316 N.J. Super. 600, 607 n.5 (Ch. Div. 1998).

Furthermore, Sam can be adopted even if an adult. Our adoption statute, N.J.S.A. 2A:22-1, "is liberally construed to give due regard to the right of all persons affected." In re Adoption of Adult by G.V.C., 243 N.J. Super. 651, 653 (Ch. Div. 1990). The Division has the authority to continue to protect Sam.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2421-17T2