998 A.2d 409

STATE OF NEW JERSEY IN THE INTEREST OF J.S.

Argued February 22, 2010—Decided July 8, 2010.

*James D. Harris,* Deputy Attorney General, argued the cause for appellant (*Paula T. Dow,* Attorney General, attorney; *Melissa H. Raksa,* Assistant Attorney General, of counsel).

*Douglas K. Wolfson* argued the cause for respondent (*Greenbaum, Rowe, Smith, & Davis,* attorneys; *Mr. Wolfson,* of counsel; *Mr. Wolfson, Hany A. Mawla,* and *Emily A. Kaller* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

As a minor, J.S. sexually assaulted his younger sister. However, he was twenty-one years old when the juvenile court entered an order adjudicating him a delinquent based on the conduct that had occurred years earlier. The court's order required the Division of Youth and Family Services (DYFS), an agency within the

Department of Children and Families (DCF),[1] to provide him with sex offender treatment, notwithstanding that neither J.S. nor his family previously had any involvement with DYFS. Although not a party to J.S.'s delinquency proceedings, DYFS sought reconsideration, and then appealed. DYFS claimed, at each opportunity for review of the order, that the court lacked authority to require DYFS to bear the responsibility of providing sex offender services to the adult J.S. because he was not within the category of persons to be serviced under DYFS's authorizing statutes. We agree and therefore reverse.

## I.

Between January 2000 and December 2002, when he was in his early to mid-teens,[2] J.S. digitally penetrated his sister, who was then under the age of thirteen. On October 15, 2007, J.S., who by then had turned twenty-one, pleaded guilty in juvenile court to first-degree aggravated sexual assault in violation of *N.J.S.A.* 2C:14-2(a)(1).[3] At the time of his plea, J.S. was employed and was studying to become a nurse. He had not had any prior contact with the criminal justice system, and neither he nor his family had any prior involvement with DYFS.

The juvenile court adjudicated him delinquent and determined that pre-dispositional psycho-sexual, psychological, and psychiatric reports were required. The court desired that Steininger Behavioral Care Services (Steininger), a third-party contractor for the

---

[1] In this decision, DCF and DYFS are used interchangeably.

[2] The trial record and Appellate Division opinion stated that J.S. was between fourteen and sixteen years old. The briefs submitted by DYFS claim that he was between thirteen and fifteen years old.

[3] The juvenile court stated that it accepted J.S.'s admission to a violation of *N.J.S.A.* 2C:14-2(a)(1), and agreed to sentence him as if it were a second-degree offense as per the State's agreement. The State had moved at the hearing to amend the count to *N.J.S.A.* 2C:14-2(a)(2)(a), but the plea, in fact, was entered to *N.J.S.A.* 2C:14-2(a)(1).

Division of Child Behavioral Health Services in the DCF, provide the necessary evaluations.

THE COURT: ... I'm going to order that Steininger do the evaluations. He's not eligible for DYFS as I understand it. So—so I'm going to order that Steininger do it. You don't think they will?

FEMALE VOICE: No. Based upon his age and the fact that he's 21 years old.

THE COURT: What's the alternative?

FEMALE VOICE: The alternative is to have the family through their private insurance or through their—his attorney to provide evaluations for him.

THE COURT: I would doubt that they have insurance and I would doubt—I mean—

[PUBLIC DEFENDER]: I seriously doubt that (indiscernible) be pay for that, yeah.

THE COURT: Yeah.

[ASSISTANT PROSECUTOR]: And I don't think it's appropriate for the Public Defender's Office to do the Court eval—

THE COURT: I'm going to order that Steininger do it.

The juvenile court thereupon ordered J.S. under the care and supervision of DYFS, and further ordered that DYFS "[s]upply a written plan within 14 day[s]." The order specified that DYFS was to obtain the psychological and psychiatric evaluations, as well as to "obtain a sex offender evaluation and treatment" and "provide status of case"; it also stated, "Steininger to do evals." [4] The only additional fact of note from the October 15, 2007, hearing concerns who was, and was not, present. Present were J.S.; an assistant prosecutor; a public defender; J.S.'s mother, aunt, and grandmother; and officers of the court. Neither DYFS nor Steininger were represented. They were not parties and were not otherwise involved in the matter.

On November 1, 2007, DYFS filed a motion for reconsideration and vacation of the order on the basis that the court lacked authority to order DYFS to provide services to an individual who already had turned twenty-one years of age and who had no previous involvement with DYFS.

---

[4] The court scheduled a disposition hearing for November 14, 2007, and also ordered that J.S. be placed on home detention and that he not have any contact with the victim.

While DYFS's motion was pending, the court-ordered evaluations were conducted, despite DYFS's request that Steininger await resolution of the motion for reconsideration. The psychological evaluation found that J.S. did not have any personality disorder or pathology. The evaluation included assessment of J.S.'s risk of sexually reoffending based on the Resident Risk Assessment Scale (RRAS). The RRAS assessment revealed that J.S. was a low risk. Nevertheless, the psychologist's evaluation stated that J.S. could benefit from individual counseling to enable him to achieve a better understanding of his actions. As for the psychiatric evaluation, it revealed that J.S. was not suffering from any major psychiatric disorders or personality disorders and that there was no current indication for psychiatric treatment. The evaluating psychiatrist stated that J.S. "would benefit from counseling to deal with the ongoing issues of guilt, remorse and the sequellae from the issues surrounding his charges," and that J.S. could receive such counseling through his church, if that venue was comfortable for him. That said, the psychiatrist's conclusion was that J.S. did not pose a threat to himself or to others.

DYFS's motion for reconsideration was heard on November 14, 2007, the date of the disposition hearing. As described by the court,

[DYFS] has asked that it be relieved of its obligation under my order to provide evaluations since this young man is more than 21 years of age, has no history with [DYFS], and although the offenses were committed when he was a juvenile, no services were provided at that time, and no file was opened until he was after 21 years of age.

In colloquy, both DYFS and the court initially appeared to view the issue as moot as to J.S. because his evaluations did not result in a recommendation of future services. Nevertheless, DYFS pressed its legal argument, concerned about the possibility of future orders being entered against the agency in delinquency dispositions involving individuals over the age of twenty-one who had no prior involvement with DYFS.

Although the prosecutor took no position as to whether DYFS should provide sex offender services under the circumstances, the prosecutor did have a position on the disposition. Despite the

recommendations of both the psychiatric and psychological evalua-
tions that no services were required, the prosecutor recommended
that J.S. receive, at a minimum, outpatient sex offender treatment,
because ordering no counseling "just seem[ed] to be somewhat
offensive to the State." The public defender agreed that despite
the recommendations, J.S. "probably . . . could use and benefit
from some counseling." Unlike the prosecutor, the public defend-
er urged the court to order DYFS to provide the services.

The court held that, under the Juvenile Justice Code (Code), it
had the authority and the intention to order DYFS to provide
services for J.S., because he committed an offense while a juvenile,
and because the condition for which he required counseling existed
when he was a juvenile. The court stated that

> his age is not the controlling factor as far as I'm concerned. As far as I'm
> concerned it's when the incident occurred, what the nature of the incident was, was
> any condition that might require treatment present before he was 21, and I would
> argue yes, because he committed this when he was a juvenile, and it was a sex
> offense committed on a family member who was very, very young. And lastly, it is
> incongruous, and I believe contrary to the purpose of the act, to suggest that if
> fortuitously the complaint is made by the victim before the offender turns 21, that's
> what controls it. Where fortuitously a file is opened before on any matter, before
> the offender is 21, that's what controls it. That seems to me to be so contrary to
> the nature and intent of the act that it would be inappropriate for me to order that.

The court was not persuaded by the argument that its order was
unsupported by the evaluators' recommendations, or that DYFS
had no services that it could provide J.S. given that he was an
adult and its responsibilities are to children. The disposition
required that J.S. serve a three-year period of probation condi-
tioned upon successful completion of sex offender treatment
through a licensed professional. The court ordered DYFS to fund
the treatment, but added that DYFS could pursue reimbursement
if J.S. had private health insurance. The court further ordered
J.S. not to have contact with the victim until the conclusion of
probation and informed J.S. that he was subject to Megan's Law
requirements, pursuant to *N.J.S.A.* 2C:7–1 to—11.

DYFS appealed. No other party or entity appeared in the
proceedings before the Appellate Division. In an unpublished
opinion, the appellate panel affirmed the juvenile court's order

requiring DYFS to provide sex offender treatment to J.S. The panel held that J.S., an adjudicated delinquent, "falls within the protective scope of the Juvenile Justice Code" because *N.J.S.A.* 2A:4A–22 and—25 give juvenile courts jurisdiction over persons beyond the age of eighteen who committed an offense while under the age of eighteen. The panel also noted that the Code offers a number of dispositions that a court may impose in lieu of criminal penalties. One of those dispositions includes ordering DYFS, through DCF, to provide services to an adjudicated delinquent. *See N.J.S.A.* 2A:4A–43(b)(5). Although it acknowledged that DYFS's services generally are limited to children under the age of eighteen, the Appellate Division noted that DYFS is authorized to provide certain services to youths between eighteen and twenty-one years of age if a youth had received DYFS services before reaching the age of eighteen. *N.J.S.A.* 30:4C–1.1(g). Because the panel found that the statutes governing DYFS and those contained in the Code share the common purpose of providing necessary services to adjudicated delinquents, the panel affirmed the trial court's order. *See N.J.S.A.* 30:4C–1(d).[5]

We granted DYFS's petition for certification, 198 *N.J.* 474, 968 *A.*2d 1190 (2009). Although J.S. did not participate in any of the appellate proceedings, we also elected to have attorney representation on his behalf, and we secured pro bono counsel to appear for that purpose.[6]

Before this Court, DYFS argues that nothing in the Code authorized the juvenile court to override the statutes that govern

---

[5] The panel declined to address DYFS's argument that it should not have been required to pay for the pre-dispositional evaluations because the issue was moot. Similarly, the panel did not address DYFS's arguments that (1) *N.J.S.A.* 2A:4A–43(b)(5) does not authorize the court to order a specific service, and (2) the costs of the services to be provided to J.S. should be paid by Camden County, because neither argument was raised before the juvenile court, and because Camden County was not a party to the proceedings. Those arguments also were advanced before this Court.

[6] It is a testament to the pro bono dedication of our State's bar that an esteemed member volunteered his services for this purpose.

DYFS's authority. The disposition involving J.S. is argued to be outside DYFS's statutory power and responsibility because J.S. was a twenty-one-year-old adult who had no previous involvement with DYFS. Because DYFS was not involved in the proceeding prior to the disposition, it was unable to explain its inability to provide adult services in light of its statutory mandate as an agency focused on children. Moreover, by ordering DYFS to fund services for J.S., a working adult, the court improperly diverted limited resources away from children in need of services. DYFS points out that even if J.S. could not privately afford to fund the disposition, *N.J.S.A.* 2A:4–41 directs that county resources should be diverted for that purpose.

J.S. defends the trial court and Appellate Division decisions, arguing that, as a court of equity, the juvenile court had broad jurisdiction to order services, and, in fact, retains "unlimited jurisdiction over a juvenile, which is to be relinquished only after its disposition has been fulfilled." Therefore, the disposition for J.S., an adjudicated juvenile delinquent, properly directed DYFS to provide services. Pointing to the Code and the statutes governing DYFS, J.S. argues that age is less important a consideration than the public policy goals of protecting the public, preserving the safety of the victims, and rehabilitating juvenile offenders, which all militate in favor of providing services to one adjudicated a delinquent regardless of age. In addition to his parsing of the intersection of the two statutory schemes, J.S. contends that DYFS's failure to seek a stay of the trial court's decision, or to seek a hearing regarding the treatment ordered by the court, renders the agency's request for relief both moot and waived. Moreover, J.S. points to DYFS's failure to abide by the plain requirements of *N.J.S.A.* 2A:4A–43(b)(5), which places the onus on DYFS to develop a plan following disposition of a case and, if the court rejects the plan, to request a hearing, and argues that DYFS should not now be entitled to relief.[7]

---

[7] J.S. also points out that, although the juvenile court expressly permitted it, DYFS never sought reimbursement for the sex offender treatment costs from J.S.'s private health insurance carrier.

## II.

### A.

The narrow issue in this appeal focuses on whether it was appropriate to make DYFS shoulder the responsibility to provide sex offender treatment services to J.S. It was clear from the record that the juvenile court intended that there be a full evaluation of J.S.'s psychiatric and psychological state and, further, that the court wanted its provider of choice—Steininger—to perform those functions. On the basis of the prosecutor's reaction to those evaluations, which was shared by the public defender, the court required J.S. to participate in sex offender treatment as a condition of receiving probation.

We find nothing out of the ordinary in the juvenile court's determination to exercise its discretion to order probation and to place that condition of probation on J.S. Placing J.S. on probation with such a condition was entirely within the court's authority under the Code, and we so hold under *N.J.S.A.* 2A:4A–43(b)(3)'s express language authorizing the same. The court erred, however, in believing that the appropriate mechanism for effectuating that disposition was *N.J.S.A.* 2A:4A–43(b)(5). Our conclusion is based on a straightforward reading of two statutory schemes: the Juvenile Justice Code and the statutes governing DCF and its organizational unit, DYFS.

### B.

The Juvenile Justice Code is our starting point because it is the operative statutory scheme for resolving juvenile delinquency matters. Under the Code, a juvenile is "an individual who is under the age of 18 years," *N.J.S.A.* 2A:4A–22(a), and an adult is "an individual 18 years of age or older," *N.J.S.A.* 2A:4A–22(b). The Code reposes in the juvenile courts "exclusive jurisdiction in all cases where it is charged that a juvenile has committed an act of delinquency and over all matters relating to a juvenile-family crisis." *N.J.S.A.* 2A:4A–24(a). In addition, the juvenile courts

have jurisdiction, with certain exceptions not applicable here, over any "person [who] was a juvenile at the time of the crime, offense or violation charged." *N.J.S.A.* 2A:4A–25. Therefore,

> if during the pendency in any other court of a case charging a person with a crime, offense or violation, it is ascertained that such person was a juvenile at the time of the crime, offense or violation charged, such court shall immediately transfer such case to the Superior Court, Chancery Division, Family Part. The Family Part shall thereupon proceed in the same manner as if the case had been instituted under this chapter in the first instance.
>
> [*Ibid.*]

Indeed, the Code's legislative history indicates the extension of the juvenile court's jurisdiction "in matters of delinquency and juvenile-family crisis to the juvenile's parent, guardian and other family members contributing to a juvenile-family crisis." Assemb. 641 (Sponsor's Statement), 200th Leg. (N.J. 1982). The Legislature explained that the extended jurisdiction is the "gravamen of effective family participation and responsibility in juvenile matters." *Ibid.*

In this matter there is no dispute that the juvenile court was empowered to adjudicate J.S.'s act of delinquency. The dispute's entire focus is on whether the disposition chosen by the juvenile court was appropriately effectuated through DYFS. We turn therefore to the relevant provisions in the Code and in DYFS's authorizing statutes.

## C.

The Code authorizes a juvenile court to select for imposition, in lieu of incarceration, one or more of twenty available dispositions. *See N.J.S.A.* 2A:4A–43(b); *State ex rel. C.V.,* 201 *N.J.* 281, 295, 990 A.2d 640 (2010) (noting twenty enumerated dispositions and further observing that "[o]ne of the 'major hallmarks of the Code' was to provide the newly created, specialized family court with flexibility in juvenile dispositions" (citation omitted)). One enumerated disposition, *N.J.S.A.* 2A:4A–43(b)(5), directly implicates DYFS. It authorizes the juvenile court to

[p]lace the juvenile under the care and responsibility of the Department of Children and Families so that the commissioner may designate a division or organizational unit in the department pursuant to *P.L.* 1951, *c.* 138 (C.30:4C–1 et seq.) for the purpose of providing services in or out of the home. Within 14 days, unless for good cause shown, but not later than 30 days, the Department of Children and Families shall submit to the court a service plan, which shall be presumed valid, detailing the specifics of any disposition order. The plan shall be developed within the limits of fiscal and other resources available to the department. If the court determines that the service plan is inappropriate, given existing resources, the department may request a hearing on that determination.
[*N.J.S.A.* 2A:4A–43(b)(5).]

■ Aside from one other disposition that allows a juvenile court to commit a juvenile to DCF for placement in a hospital or facility when the juvenile is in need of involuntary commitment, *N.J.S.A.* 2A:4A–43(b)(7), subsection (b)(5) provides the sole authority for the juvenile court to require DCF to provide services to an adjudicated delinquent, *see N.J.S.A.* 2A:4A–43(b). Indeed, aside from reference to custodial dispositions, none of the other enumerated dispositions in *N.J.S.A.* 2A:4A–43(b) are tied to a particular state agency or office.[8] When imposing dispositions where no agency or person is explicitly required to provide and, therefore, fund the disposition,[9] the Code requires the county of residence of the adjudicated delinquent to incur expenses related to the disposition. *See N.J.S.A.* 2A:4–41 ("Except as otherwise provided by law, all expenses incurred in complying with the provisions of this chapter shall be a county charge."). Thus, although the Code provides a wide range of dispositional choices to the juvenile court, the authority to impose expenses on a governmental entity other than the county exists only where expressly provided by law.

---

[8] For completeness, we note that one other subsection, *N.J.S.A.* 2A:4A–43(b)(6), authorizes the juvenile court to commit a juvenile to the Department of Human Services for the purpose of receiving the services of the Division of Developmental Disabilities, provided the juvenile meets the eligibility requirements for its specialized services.

[9] Several dispositions require the adjudicated delinquent or his or her parent to pay restitution or a fine.

DYFS, on the other hand, is subject to a distinct set of statutory commands in respect of its authority and its resources. As the successor to the State Board of Child Welfare and the State Board of Children's Guardians, DYFS was established as "the State agency for the care, custody, guardianship, maintenance and protection of children." *N.J.S.A.* 30:4C–2(a). Prior to the creation of DCF in 2006, DYFS was located within the Department of Human Services, which once was one of the largest agencies in New Jersey and responsible for a wide range of needs. *N.J.S.A.* 9:3A–2(c). DCF was established in the wake of a lawsuit that involved allegations that the child welfare system administered through DYFS failed to protect children from child abuse and neglect. *See N.J.S.A.* 9:3A–2(a). The Legislature created DCF to "facilitate aggressive reform of the child welfare system and ensure that the reform effort is successful." *N.J.S.A.* 9:3A–2(d). In doing so, it declared that

> it is, therefore, in the best interest of the citizens of this State to establish a principal department within the Executive Branch that *focuses exclusively on protecting children and strengthening families,* so that our State's children will have the optimum conditions in which to grow and prosper to the benefit of themselves, their families, and society as a whole. The department shall have the goal of ensuring safety, permanency, and well-being for all children, and shall have direct responsibility for child welfare and other children and family services, supported by strong inter-agency partnerships among other State departments also responsible for family services.
>
> [*Ibid.* (emphasis added).]

As a child protection and child welfare agency, DYFS primarily works with individuals under the age of eighteen. *See N.J.S.A.* 30:4C–2(b) (defining "child" as "any person under the age of 18 years"). Several provisions addressing DYFS's involvement with children and their families specifically limit the agency's reach to children under the age of eighteen. *See N.J.S.A.* 9:6–8.8 ("The purpose of this act is to provide for the protection of children under 18 years of age...."); *N.J.S.A.* 9:6–8.9 ("For purposes of this act: 'Abused child' means a child under the age of 18 years...."); *N.J.S.A.* 30:4C–51 and –52 (discussing placement of children outside their homes and defining "child" as "any person less than 18 years of age").

In certain circumstances, DYFS is responsible for young adults between the ages of eighteen and twenty-one. Two statutes address such situations; both are circumscribed and neither applies to all individuals between eighteen and twenty-one. One requires DCF to provide services to certain individuals "aged 18 to 21":

> Notwithstanding any provision of law to the contrary, the Department of Children and Families shall provide services to individuals who are between 18 and 21 years of age and meet the following conditions:
>
> a. The individual was receiving services from the department, on or after the individual's 16th birthday;
>
> b. The individual, on or after the individual's 18th birthday, has not refused or requested that these services be terminated, as applicable; and
>
> c. The commissioner determines that a continuation of services would be in the individual's best interest and would assist the individual to become an independent and productive adult.
>
> [*N.J.S.A.* 30:4C–2.3.]

When enacting that statute, the Legislature included in its findings that "[y]ouths must be provided with supports and services in their communities that will enable them to grow into healthy and productive adults; and those youths who previously received child welfare services must continue to receive those services beyond the age of 18, up to age 21, as appropriate." *N.J.S.A.* 30:4C–1.1(g).[10]

The second statutory reference to DYFS's power and responsibility over youths between the ages of eighteen and twenty-one is found in the Resource Family Parent Licensing Act. That statute enables DYFS to place a child in a resource family home, a group home, or another appropriate institution, *N.J.S.A.* 30:4C–26(a), and defines "child" as "a person who: is either under the age of 18 or meets the criteria set forth in subsection (f) of [*N.J.S.A.* 9:17B–2]; and is under the care or custody of the division or another

---

[10] This statute was enacted as part of a larger bill, with an overall purpose "to better protect abused and neglected children, and children at risk of abuse or neglect, throughout New Jersey, and more generally to improve the quality of services provided by the State to children and families in the child welfare system." Assemb. 2985 (Sponsor's Statement), 211th Leg. (N.J. 2004).

public or private agency authorized to place children in New Jersey," *N.J.S.A.* 30:4C–27.5. *N.J.S.A* 9:17B–2 was enacted as part of the legislative scheme to lower the age of majority to eighteen. Subsection (f) clarified that, by so doing, the Legislature did not intend to

> [a]lter the provision of services pursuant to the laws relating to dependent and neglected children, ... to persons between 18 and 21 years of age who seek to avail themselves of such services and who are enrolled in a school or training program below college level or who require a course of treatment for emotionally, cognitively or physically disabled persons.
>
> [*N.J.S.A.* 9:17B–2(f).]

Thus, the Resource Family Parent Licensing Act authorizes DYFS to place an individual between eighteen and twenty-one years of age in a resource family home, a group home, or another institution, when that individual is "enrolled in a school or training program below college level or ... require[s] a course of treatment for emotionally, cognitively or physically disabled persons." *N.J.S.A* 9:17B–2(f); *see N.J.S.A.* 30:4C–26(a).

Therefore, we recognize that in limited situations DYFS's services explicitly are extended to individuals who are between the ages of eighteen and twenty-one. Having detailed the statutory provisions in question, we now turn to the application of those statutes to the instant matter.

## III.

Our duty when interpreting statutes is to discern and apply the Legislature's intent. *See State v. Smith,* 197 *N.J.* 325, 332, 963 *A.*2d 281 (2009) (citation omitted). The surest path to that intent lies in the words of the Legislature. *See DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citation omitted). Our function is not to "rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language." *Ibid.* (alteration in original) (internal quotation marks and citation omitted). Thus, we strive to apply the plain and customary meaning of the statute as enacted. *See ibid.* (citation omitted).

■ Moreover, when construction involves the interplay of two or more statutes, we seek to harmonize the two, under the assumption that the Legislature was aware of its actions and intended for cognate provisions to work together. *See In re Gray–Sadler*, 164 *N.J.* 468, 485, 753 *A.2d* 1101 (2000) ("When interpreting different statutory provisions, we are obligated to make every effort to harmonize them . . . ." (citations omitted)); *Jacobs v. N.J. State Highway Auth.*, 54 *N.J.* 393, 401, 255 *A.2d* 266 (1969) (viewing cognate laws with presumption that they were intended to become "part of a consistent whole unless they or parts of them are expressly or impliedly incompatible").

■ Here it seems apparent that the juvenile court's authority to refer juveniles to the care and responsibility of DCF must be conditioned on DCF's ability to provide services to the individual referred. Such a precondition is expressly noted in respect of DCF's existing resources. *See N.J.S.A.* 2A:4A–43(b)(5) (allowing DCF to advise court on resource availability that affects its ability to provide services). Equally fundamental to DCF's ability to provide a service desired by the juvenile court in connection with a disposition is the precondition that DCF is legally charged with authority and responsibility for the type of individual referred. Administrative agencies, such as DCF, "are creatures of legislation" and thus "[t]heir powers are limited to those expressly granted by statute or those fairly implied as necessary to carry out their assigned function." *N.J. Dep't of Labor v. Pepsi–Cola Co.*, 170 *N.J.* 59, 61, 784 *A.2d* 64 (2001) (citations omitted).[11] *N.J.S.A.* 2A:4A–43(b)(5) carries no express or implied evidence of a legislative intent to expand DCF's jurisdiction and, thereby, add to its obligations. We are loathe to presume that by the language

---

[11] We recognize that express agency authority is often accompanied by implicit "incidental authority." *Pepsi–Cola Co., supra*, 170 *N.J.* at 61, 784 *A.2d* 64 (quoting *Cammarata v. Essex County Park Comm'n*, 26 *N.J.* 404, 411, 140 *A.2d* 397 (1958)). However, any power wielded by an agency should work to accomplish the legislative purpose of its enabling legislation. *Ibid.* (citing *Cammarata, supra*, 26 *N.J.* at 411, 140 *A.2d* 397).

of *N.J.S.A.* 2A:4A–43(b)(5) the Legislature meant to expand, sub silentio, DCF's statutory powers and responsibilities to persons over the age of eighteen beyond the Legislature's express decree for DCF and DYFS. *See Pepsi–Cola Co., supra,* 170 *N.J.* at 61, 784 *A.*2d 64 (observing that agency authority through "inherent or implied power is not boundless" (citation omitted)). Rather, the subsection speaks to having the juvenile court hear from DCF as to whether the agency can provide the service needs for the juvenile. In our view, the threshold answer to that question must come first from an analysis of DCF's authorizing statutes.

 Here it is clear that because DYFS, as the unit within DCF that was the focus of the court's order, was not assigned responsibility for adults like J.S., aged twenty-one, who had never before had a connection with the agency, the juvenile court erred in ordering DYFS to accept responsibility for sex offender treatment for J.S. That conclusion is based on the plain language of *N.J.S.A.* 2A:4A–43(b)(5) and does not evidence a conflict between the Code and the statutes governing DYFS's statutory responsibilities. Indeed we hold that there is no conflict between the two statutory schemes, making our interpretive task one of easy resolution. *Cf. In re Gray–Sadler, supra,* 164 *N.J.* at 485, 753 *A.*2d 1101 (noting obligation to harmonize statutes "even if they are in apparent conflict" (citations omitted)). The unavailability of DYFS as a service provider to J.S. does not establish the existence of any conflict between the statutory schemes. The two can and do work together, however, that working together can result in DYFS simply not being the correct vehicle for effectuating a disposition. That said, as previously noted, the juvenile court was not without power to order the disposition of probation with the condition of sex offender treatment for J.S. That disposition was available through *N.J.S.A.* 2A:4A–43(b)(3) and if J.S. did not have the resources, or access to resources, to pay for the treatment, the expense would fall to the county.[12]

---

[12] That fact that DYFS did not seek reimbursement from J.S., his private insurer, or the county even though permitted by the court, as J.S. points out,

## IV.

For completeness, we note that we were unable to identify any New Jersey precedent that addressed whether a juvenile court can require DYFS to provide services to an individual who is over twenty-one and not within the limited group of over-eighteen-year-olds that DYFS is charged with responsibility to serve. Few cases even address whether a juvenile court can require DYFS to provide services to an individual who has reached eighteen years of age.

The most relevant case, to which DYFS points as support for its position, is *In re K.F.*, 313 *N.J.Super.* 319, 712 *A.*2d 1212 (App.Div. 1998). K.F. had been charged with conduct constituting juvenile delinquency nine days before he turned eighteen, but the hearing occurred after he turned eighteen. *In re K.F., supra*, 313 *N.J.Super.* at 321, 712 *A.*2d 1212. The juvenile court imposed a probationary sentence, but five months later entered a new dispositional order that placed K.F. in the care and supervision of DYFS. *Ibid.* After the court ordered DYFS to obtain an in-patient drug treatment program for him, DYFS sought reconsideration, arguing, similar to its argument here, that it could not provide services for K.F. because he was over the age of eighteen and had not previously received services from DYFS. *Id.* at 321–22, 712 *A.*2d 1212. The court denied the motion and, ultimately, ordered DYFS to fund the treatment program that the court found suitable for K.F. *Id.* at 322, 712 *A.*2d 1212.

On appeal, the appellate panel affirmed, noting that when the Legislature lowered the age of majority from twenty-one to eighteen, it "expressly continued the Family Part's jurisdiction over persons between the ages of eighteen and twenty-one who had been adjudicated delinquent." *Id.* at 323–24, 712 *A.*2d 1212. The panel stated that the exception "demonstrates the Legislature's

---

does not by itself require a result holding DYFS responsible for providing services. To be sure, DYFS's decision not to seek reimbursement is consistent with its position that it was not responsible for providing treatment.

intention to continue the Family Part's jurisdiction in protecting the interests of persons under twenty-one." *Id.* at 324, 712 *A.2d* 1212 (citation omitted). Further, the Appellate Division stated that, although DYFS's primary mandate is to serve children, it also provides services to individuals between eighteen and twenty-one who meet certain criteria, and pointed out that "the Legislature has not amended the Code to provide that DYFS placement pursuant to *N.J.S.A.* 2A:4A–43(b)(5) is limited to persons under eighteen." *Ibid.* The panel concluded that the juvenile court could "impose the authorized disposition of DYFS placement upon an individual who is between the ages of eighteen and twenty-one." *Ibid.*

Thus, the Appellate Division's holding in *In re K.F.* concluded that the juvenile courts are authorized under *N.J.S.A.* 2A:4A–43(b)(5) to impose a disposition that places an eighteen-year-old individual under the care of DYFS, regardless of DYFS's usual focus on children under eighteen. The rationale behind that holding was supported by language in DYFS's authorizing statutes that explicitly address DYFS's responsibility to continue services to certain individuals between eighteen and twenty-one. That holding does not carry the day in respect of the different facts in the instant matter in which J.S. attained twenty-one years before his adjudication was finalized. Moreover, the statutory landscape has changed since the *K.F.* decision.

In 2004, the Legislature adopted a statute specifically focused on, and limiting, DCF's responsibility to children between eighteen and twenty-one. *See N.J.S.A.* 30:4C–2.3 ("[DCF] shall provide services to individuals who are between 18 and 21 years of age."). It also is not insignificant that DYFS is no longer in the Department of Human Services, which serves a variety of disadvantaged and disabled adults, but now is in DCF, which focuses exclusively on children. In our view, we find the most recent, specific legislative expression of intent regarding the extent of DCF's authority highly persuasive. Thus, even were we to agree with the argument that J.S., a twenty-one-year-old, falls into the

exception recognized by the Appellate Division in *K.F.*, we would have to conclude that he does not fall into the limited eighteen-to-twenty-one age exception created by *N.J.S.A.* 30:4C–2.3.[13]

In addition, and in conclusion, we find that DYFS raises several persuasive policy considerations in respect of the narrow question before us, not the least of which is its concern for over-reliance on its limited resources. As asserted by DYFS, because it is a child welfare agency, it does not have existing "contracts covering ordered services for adults." Indeed, "[m]ost services for which [DYFS] does contract take children but will not accept adults." Thus, to require DYFS to provide services to J.S. would mean that DYFS's fiscal resources will be diverted from children to an adult with no prior contacts with DYFS. That result is neither an efficient use of DYFS's resources nor one that is within DYFS's statutory mandate.

Further, juvenile courts are authorized to require adjudged delinquents or their parents to pay fines or restitutions. *See N.J.S.A.* 2A:4A–43(b)(8), (9), (19). Similarly, adult offenders can be required to pay fines or to pay for treatment or evaluations, if possible. *See, e.g., N.J.S.A.* 2C:43–3 (person who has been convicted may be sentenced to pay fine or make restitution); *N.J.S.A.* 2C:43–3.1 (conviction for certain crimes requires paying assessment); *N.J.S.A.* 2C:44–6.1 (inmate liable for cost of psychological evaluation). There is no reason not to turn to J.S.'s private resources; and, if such a private source is unavailable, as noted

---

[13] To the extent that J.S. argues that *Monmouth County Division of Social Services v. C.R.*, 316 *N.J.Super.* 600, 720 *A.2d* 1004 (Ch.Div.1998), supports the proposition that age should not be the sole determinant of an individual's eligibility for DYFS services, we find the case inapposite. That case focused on a parent's continued support obligation for his own child past the age of majority when DYFS had terminated services immediately before the child's twenty-first birthday. *C.R., supra,* 316 *N.J.Super.* at 603, 720 *A.2d* 1004. In that setting, the court determined that DYFS's involvement may extend beyond age eighteen, to twenty-one, if the facts of the case warrant such a result. *Id.* at 616, 720 *A.2d* 1004. The case does not address whether a court can require DYFS to provide services for an individual who is twenty-one years old.

previously, then the county can be held responsible for the related service of sex offender treatment that the juvenile court determined was appropriate for J.S. *See N.J.S.A.* 2A:4–41. We hold, therefore, that it was error for the juvenile court to have held DYFS responsible for sex offender treatment for the adult J.S.

## V.

For the foregoing reasons, the order directing DYFS to be responsible for the sex offender treatment ordered for J.S. is reversed and the matter remanded for proceedings consistent with this opinion.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO, and HOENS—7.

*Opposed*—None.