REISNER, P.J.A.D.
*21 In O.Y.P.C. v. J.C.P., 442 N.J.Super. 635, 126 A.3d 349 (App. Div. 2015), we addressed the Family Part's jurisdiction over persons between the ages of eighteen and twenty-one who apply to the Family Part for predicate findings in special immigrant juvenile (SIJ) cases. In this case, we consider the Family Part's jurisdiction to grant an application for child custody, made in connection with an SIJ-related application. In the factual circumstances presented here, we hold that, pursuant to N.J.S.A. 9:17B-3, the Family Part has jurisdiction to grant a parent custody of an unemancipated child who is over eighteen, but under twenty-one, and to issue a declaratory ruling that the child is dependent on the parent and is not emancipated.
I
As context, we briefly review the pertinent immigration legislation as it relates to this case. Plaintiff A.E.C. (Ana)[1] filed a complaint in the Family Part as a predicate to obtaining SIJ status for her son J.S.E., pursuant to the Immigration Act of 1990, as amended by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457, 122 Stat. 5044 (2008). The SIJ application is a two-step process, requiring participation by the state courts and the United States Citizenship and Immigration Services (USCIS). H.S.P. v. J.K., 223 N.J. 196, 209-11, 121 A.3d 849 (2015).
First, the child, or an individual acting on the child's behalf, must "petition for an order from a state juvenile court making findings that the juvenile satisfies certain criteria."
*22 Id. at 210, 121 A.3d 849 (citation omitted). Pursuant to 8 U.S.C. § 1101(a)(27)(J) and 8 C.F.R. § 204.11(c), the Family Part must make findings on the following factors:
(1) The juvenile is under the age of 21 and is unmarried;
(2) The juvenile is dependent on the court or has been placed under the custody of an agency or an individual appointed by the court;
(3) The "juvenile court" has jurisdiction under state law to make judicial determinations about the custody and care of juveniles;
(4) That reunification with one or both of the juvenile's parents is not viable due to abuse, neglect, or abandonment or a similar basis under State law; and *426 (5) It is not in the "best interest" of the juvenile to be returned to his parents' previous country of nationality or country of last habitual residence within the meaning of 8 U.S.C. § 1101(a)(27)(J)(ii) ; 8 C.F.R. § 204.11(a), (d)(2)(iii) [amended by TVPRA 2008].
[ H.S.P., 223 N.J. at 210, 121 A.3d 849 (quoting In re Dany G., 223 Md.App. 707, 117 A.3d 650, 655-56 (Md. Ct. Spec. App. 2015) ).]
Once the state family court makes the necessary preliminary findings, the "juvenile can submit his or her application for SIJ status to USCIS in the form of an I-360 petition. If USCIS approves the juvenile's I-360, he or she will be granted SIJ status." Ibid.
In H.S.P., the Court made clear that the Family Part does not decide the applicant's SIJ status. Id. at 211-12, 121 A.3d 849. Rather, in handling SIJ-related applications, the Family Part must "apply its expertise in family and child welfare matters to the issues raised in 8 C.F.R. § 204.11, regardless of its view as to the position likely to be taken by the federal agency or whether the minor has met the requirements for SIJ status." Id. at 200-01, 121 A.3d 849. "This approach will provide USCIS with sufficient information to enable it to determine whether SIJ status should be granted or denied...." Id. at 201, 121 A.3d 849.
II
J.S.E. was born in March 1997 in Guatemala, where he initially resided with his mother, Ana, and his father, Pascual. However, Pascual was physically and emotionally abusive to Ana, and when J.S.E. was still a baby, Pascual threw Ana and J.S.E out of the *23 house. J.S.E. did not see his father again until years later, when they met once. At that point, the father was mentally ill and confined to a room in his parents' house. The father died in 2009.
After the father ejected them from their home, Ana and the baby moved in with her Aunt Catarina. However, Ana struggled to make ends meet, and moved to the United States when J.S.E. was about five years old. Ana left the child in the care of her friend Anacleta. For years, she sent Anacleta money for the child's support. However, when J.S.E. was nine years old, Ana received an anonymous letter warning her that J.S.E. was walking around alone, hungry, and in dirty clothes. Ana learned that Anacleta was physically abusing the child, depriving him of food, and spending the support money on herself.
Ana then arranged for J.S.E. to live with her aunt. However, when J.S.E. was about seventeen years old, the aunt made it clear that she could no longer care for him and believed he should move to the United States to live with his mother. Because there was no one to provide for J.S.E. in Guatemala, he fled to the United States. At the time of the SIJ application, J.S.E. was attending a special school and going to counseling for his emotional trauma.
In September 2016, Ana filed a verified complaint in the Family Part, under 8 U.S.C. § 1101(a)(27)(J) and 8 C.F.R. § 204.11(c), seeking the findings required for SIJ status. She also specifically sought sole legal and physical custody of her son, who was "a full time student still dependent on his mother for his emotional, financial, educational, and safety needs." The complaint asserted that there was no one else "willing and able" to care for him. Ana further sought a ruling that the Family Part had jurisdiction over J.S.E. and that he was "not emancipated."
After hearing testimony from J.S.E. and his mother, the Family Part judge found that, due to "the abuse he suffered at a *427 young age, [J.S.E.] did not acquire the skills necessary to provide for himself. [Ana] is the only suitable caregiver who can help him transition to adulthood.... It is clearly in the best interest of [J.S.E.] to remain in the custody of his mother." However, the *24 judge declined to grant custody, reasoning that the Family Part did not have jurisdiction to enter an order placing J.S.E. in his mother's custody, because he was over the age of eighteen. The judge also did not specifically issue a declaration that J.S.E. was not emancipated, although the judge's factual findings made clear that was the case. Based on his view that the court lacked jurisdiction due to J.S.E.'s age, he determined that J.S.E. was neither dependent on the court nor under the custody of an agency or individual appointed by the court. See 8 U.S.C. § 1101(a)(27)(J).
III
On this appeal, we review the trial court's legal conclusions de novo. H.S.P., 223 N.J. at 215, 121 A.3d 849. As previously discussed, in H.S.P., the Supreme Court explained that the Family Part's role in an SIJ application is not to adjudicate a juvenile[2] applicant's immigration status, but to make the predicate findings needed so that the federal government can adjudicate the juvenile's SIJ application. Id. at 200-01, 121 A.3d 849. In O.Y.P.C., we held that the Family Part is obligated to make SIJ findings in cases where a child is between the ages of eighteen and twenty-one. O.Y.P.C., 442 N.J.Super. at 641, 126 A.3d 349. We reasoned, in part, that "it would defeat the purpose of the hybrid federal-state scheme Congress created if state family courts decline to hear these cases solely because a juvenile is over the age of eighteen, so long as the juvenile is still under the age of twenty-one." Id. at 640, 126 A.3d 349.
In O.Y.P.C., we held it was error for the Family Part to reject O.Y.P.C.'s application on the grounds that the Family Part's jurisdiction ends when a child turns eighteen. See id. at 641, 126 A.3d 349. We also observed that this State's statutory scheme *25 gives the Family Part jurisdiction over children older than eighteen in certain circumstances. Id. at 642, 126 A.3d 349. In particular, we noted language in the age of majority statute, N.J.S.A. 9:17B-3, which preserves "the right of a court to take any action it deems appropriate and in the interest of a person under 21 years of age." Id. at 643, 126 A.3d 349.
This language was part of the Age of Majority Act (Act) when it was first adopted. See L. 1972, c. 81. The Act, changing the age of majority from twenty-one to eighteen, was enacted in 1972. See L. 1972, c. 81. The Act has been amended several times since its adoption, but the language authorizing the court to "take any action it deems appropriate and in the interest of a person under 21 years of age" has remained unchanged. See L. 1972, c. 206; L. 1987, c. 18; L. 2013, c. 103.[3]
Several months after its adoption, the Act was amended to permit the provision of "services pursuant to the laws relating to dependent and neglected children [under Title 30] to persons between 18 and 21 years of age who seek to avail themselves of such services and who are enrolled in a school or training program below college *428 level or who require a course of treatment for emotionally, cognitively or physically disabled persons." L. 1972, c. 206. As previously noted, this amendment did not eliminate or modify the existing language giving the court general power to take appropriate action in the interest of a person under twenty-one. See L. 1972, c. 206. Instead, the legislative history explained that the amendment was intended to expand the power of the state agency then charged with child welfare.
The Sponsor's Statement to the bill explained its humanitarian and fiscal purposes:
*26 This bill will permit the Department of Institutions and Agencies to continue supervision and maintenance of persons between 18 and 21 who are enrolled in a school or training program below college level or who require treatment for emotionally, cognitively or physically disabled persons.
These young adults are in foster care placement or institutions as the result of neglect, abuse or family deterioration. Because of these misfortunes, they are generally at least 1 year behind the general population in scholastic achievement.
Completion of their high school education and vocational and job training is necessary to enable them to become self-sufficient.
[Sponsor's Statement to Assembly Bill No. 1545, at 2 (Nov. 20, 1972) (L. 1972, c. 206).]
The Statement also explained that the amendment would permit children who are "seriously disabled" to participate in federally funded programs, instead of relying on "other State programs which are entirely State financed." Sponsor's Statement to Assembly Bill No. 1545, at 2-3 (Nov. 20, 1972) (L. 1972, c. 206). Nothing in the language or purpose of this amendment suggests a legislative intent to narrow the power of the Family Part "to take any action it deems appropriate and in the interest of a person under 21 years of age...." N.J.S.A. 9:17B-3.
That provision of N.J.S.A. 9:17B-3, preserving the court's authority to act in the interest of persons under age twenty-one, has generally been viewed as an expression of the Legislature's intent to protect young adults, and has been invoked to provide benefits to older juveniles where the literal terms of other statutes might not protect them. In State in Interest of G.T., 143 N.J. Super. 73, 362 A.2d 1171 (App. Div. 1976), aff'd o.b., 75 N.J. 378, 382 A.2d 1124 (1978), we found that this provision "demonstrates the intention to continue a court's discretion in protecting the interests of persons under 21." Id. at 79, 362 A.2d 1171. Relying in part on this section of the Act, we construed the term "age of majority" in the juvenile waiver statute as twenty-one[4] rather than eighteen. Id. at 76-79, 362 A.2d 1171. We declined to rely on the literal terms of *27 the juvenile justice code, which defined "adult" as a person over the age of eighteen. Id. at 76, 362 A.2d 1171.
Similarly, in Matter of K.F., 313 N.J. Super. 319, 712 A.2d 1212 (App. Div. 1998), we relied in part on the statutory language in holding that the Family Part had discretion to place an adjudicated juvenile, who had violated the terms of his probation, in the custody of the Division of Youth and Family Services (DYFS),[5] even if the juvenile *429 was then over eighteen. Id. at 321, 324, 712 A.2d 1212. DYFS argued that its mandate was "to serve children" and Title 30 defined "child" as a "person under the age of 18 years." Id. at 323, 712 A.2d 1212. However, we reasoned that the pertinent provision of N.J.S.A. 9:17B-3"demonstrates the Legislature's intention to continue the Family Part's jurisdiction in protecting the interests of persons under twenty-one." Id. at 324, 712 A.2d 1212. Considering that "the Legislature [did] not amend[ ] the Code [of Juvenile Justice] to provide that DYFS placement ... [was] limited to persons under eighteen," we "[did] not find any support for DYFS's position that the Family Part cannot impose the authorized disposition of DYFS placement upon an individual who is between the ages of eighteen and twenty-one." Id. at 324, 712 A.2d 1212.
We acknowledge that, more recently, the Supreme Court distinguished K.F., but we do not regard that decision as requiring a different result here. In State ex rel. J.S., 202 N.J. 465, 998 A.2d 409 (2010), the Court held that the juvenile court could not order the Department of Children and Families (DCF) and its subsidiary division, DYFS, to pay for sex offender treatment for a sex offender who had never before received services from DYFS and was over the age of twenty-one when he was first adjudicated delinquent.[6] Id. at 468, 481, 998 A.2d 409. The Court held that *28 doing so was contrary to the agency's enabling statute and would divert its scarce financial resources in a manner contrary to the Legislature's intent. Id. at 483-84, 998 A.2d 409. The Court distinguished K.F., because J.S. was over the age of twenty-one, and because recent legislation had limited the jurisdiction of DCF to focus "exclusively on children." Id. at 483, 998 A.2d 409. Neither party apparently relied on N.J.S.A. 9:17B-3, and the Court did not refer to that statute. But we infer from the decision that N.J.S.A. 9:17B-3 cannot be construed as overriding specific contrary provisions of another statute, and particularly provisions indicating the Legislature's intent to limit an agency's services to only persons under eighteen.
In this case, there are no State fiscal considerations similar to those in J.S., and there is no statute that specifically prohibits the Family Part from granting a parent custody of a dependent child over the age of eighteen. Indeed, the idea that child custody necessarily ends, or is barred, when a child turns eighteen, is belied by the case law concerning emancipation. These related concepts were addressed in the seminal case of Newburgh v. Arrigo, 88 N.J. 529, 443 A.2d 1031 (1982), which held that in appropriate circumstances, parents must contribute to the college expenses of a child over age eighteen. Id. at 543, 443 A.2d 1031.
In general, emancipation is the act by which a parent relinquishes the right to custody and is relieved of the duty to support a child. Emancipation can occur upon the child's marriage, induction into military service, by court order based on the child's best interests, or by attainment of an appropriate age. Although emancipation need not occur at any particular age, a rebuttable presumption against emancipation exists prior to attaining the age of majority, now 18. See N.J.S.A. 9:17B-3. Attainment of age 18 establishes prima facie, but not conclusive, proof of emancipation. Whether a child is emancipated at age 18, with the correlative termination of the right to *430 parental support, depends upon the facts of each case.
[ Id. at 543-44, 443 A.2d 1031 (citations omitted).]
There is ample precedent for declaring children over the age of eighteen to be unemancipated when they are still completing their education, are economically dependent on their parents, and remain within the parental "sphere of influence and responsibility."
*29 Filippone v. Lee, 304 N.J.Super. 301, 308, 700 A.2d 384 App. Div. 1997) (quoting Bishop v. Bishop, 287 N.J.Super. 593, 598, 671 A.2d 644 (Ch. Div. 1995) ); see also N.J.S.A. 2A:34-23(a) (incorporating several of the Newburgh factors in the child support statute); Kiken v. Kiken, 149 N.J. 441, 449-50, 694 A.2d 557 (1997). In the circumstances of this case, J.S.E., who has not even completed high school and is financially dependent on his mother, fits the definition of an unemancipated child. Declaring J.S.E. unemancipated, to protect his continued right to support, and granting Ana custody of him would further the benevolent purpose of N.J.S.A. 9:17B-3 to protect young adults.
We therefore hold that N.J.S.A. 9:17B-3 confers jurisdiction on the Family Part, in an appropriate case, to place a non-emancipated child between the ages of eighteen and twenty-one in a parent's custody, and to declare the child unemancipated, where that disposition is in the child's best interest and both the child and the parent consent. We also hold that it was error for the Family Part to deny that relief here, where J.S.E. is clearly not emancipated, still attends a special "last-chance" high school, cannot provide for himself economically, has no one else on whom he can depend for financial support, and would face dire circumstances if he were separated from his mother or if she did not financially support him.
Lastly, to address the related SIJ issue, we conclude that either a declaration of unemancipation or a custody order would justify the court in noting, for purposes of an SIJ finding, that the child is "dependent" on the court. See 8 C.F.R. § 204.11(c). A finding of dependency dovetails with the underlying purpose of the pertinent language in N.J.S.A. 9:17B-3, which recognizes that in appropriate situations, young adults still depend on the protection of the Family Part. See Recinos v. Escobar, 473 Mass. 734,46 N.E.3d 60, 67-68 (2016) (noting that the SIJ statute "does not limit the dependency requirement to a custody determination.").[7]
*30 IV
Having determined that the Family Part erred, we next consider the appropriate remedy. After hearing Ana's and J.S.E.'s credible testimony, the Family Part judge made specific factual findings concerning J.S.E.'s best interests, and the evidentiary record strongly supports his findings. See Cesare v. Cesare, 154 N.J. 394, 412-13, 713 A.2d 390 (1998). Based on those findings, which include the judge's conclusion that "[i]t is clearly in the best interest of [J.S.E.] to remain in the custody of his mother," the correct outcome is not in doubt. In view of the time sensitive nature of this case, we exercise our original jurisdiction to determine that J.S.E. shall be declared unemancipated and shall be placed in his mother's custody pursuant to N.J.S.A. 9:17B-3.[8] We remand this case to the Family Part, for the limited purpose of *431 issuing an amended order so providing, and finding that J.S.E. is dependent on the court for SIJ purposes.
We also note the need for an additional correction to the order, perhaps caused by an inadvertent error. Paragraph three of the Family Part's order marked as "denied" a proposed finding that "[t]he 'juvenile court' has jurisdiction under state law to make judicial determinations about the custody and care of juveniles." That question addresses the Family Part's general jurisdiction, not its specific jurisdiction to grant relief in this case. See H.S.P., 223 N.J. at 210, 121 A.3d 849 ; 8 C.F.R. § 204.11(a) ("Juvenile court means a court located in the United States having jurisdiction under State law to make judicial determinations about the custody and care of juveniles."). For purposes of an SIJ application filed in the Family Part, the answer to that general question should always be "yes" or "granted," depending on how the order is structured. On remand, that error must also be corrected in the amended order.
*31 The Family Part shall issue an amended order within ten days of the date of this opinion.
Reversed and remanded. We do not retain jurisdiction.

We use pseudonyms and initials to protect the parties' privacy.

Because the federal statute accords "special immigrant juvenile" status to persons up to the age of twenty-one, we use the terms "juvenile" or "child" to refer to these applicants, including J.S.E.

The 1987 amendment concerned the Uniform Gifts to Minors Act. The 2013 amendment was part of an omnibus act to remove from State statutes pejorative terms pertaining to persons with disabilities and made other changes not relevant to this appeal.

The pertinent provision required the court to determine whether there were "no reasonable prospects for rehabilitation of the juvenile prior to his attaining the age of majority...." Id. at 75, 362 A.2d 1171 (quoting N.J.S.A. 2A:4-48 ).

DYFS is now known as the Division of Child Protection and Permanency.

The sexual offenses occurred when J.S. was in his early to mid-teens, but they apparently were not reported until years later. J.S., 202 N.J. at 468, 998 A.2d 409. Hence, he was prosecuted as a juvenile.

In light of our decision, we need not address plaintiff's additional appellate issues.

In future cases, where the juvenile may turn twenty-one while the appeal is pending, counsel should file a motion to accelerate the appeal.