# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0236-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

W.B.,

      Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.B.,

      a Minor.

_____

         Submitted July 9, 2019 – Decided September 27, 2019

         Before Judges Nugent and Accurso.

         On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FG-02-0035-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Louis W. Skinner, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Jane S. Blank, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (David Ben Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant, W.B. (Wendy), appeals from an August 29, 2018 guardianship judgment terminating her parental rights to her son, G.B. (Gil), now five years old.[1] She contends that plaintiff, the Division of Child Protection and Permanency (the Division), failed to prove by clear and convincing evidence that terminating her parental rights was in the child's best interests, the standard codified in N.J.S.A. 30:4C-15.1(a). The Division and the Law Guardian oppose the appeal. Finding ample credible evidence in the record to support the trial court's determination that the Division clearly and convincingly proved the statutory criteria, we affirm.

---

[1] We use pseudonyms for the parties to protect their privacy.

This litigation began in April 2016 as a Title 30 action when the Division filed an Order to Show Cause for Care and Supervision of Gil. On the return date, the court placed Gil under the Division's care and supervision and ordered the Division to provide services to ensure his health and safety. In September of the same year, the Division filed a complaint for custody of Gil. One year later, in September 2017, the Division filed the guardianship complaint. The court conducted a guardianship trial in May and July 2018, and issued its opinion terminating Wendy's parental rights on August 29, 2018. Wendy appealed from the ensuing order.

During the guardianship trial, in addition to its documentary evidence, the State presented the testimony of a DCPP caseworker, a DCPP adoption worker, an expert psychologist, and an expert psychiatrist. Wendy, in addition to her documentary evidence, presented the testimony of Gil's maternal grandfather and an expert psychiatrist.

The State developed the following proofs. The State became involved with Wendy and Gil in November 2015 when it received a child welfare referral

from Child Protective Services of New York, West Chester County. Wendy had lived in New York but had recently moved to New Jersey.[2]

The Division's initial investigation raised concerns about Wendy's mental health and her need for appropriate parental guidance and support. Wendy was supposed to be taking psychotropic medication for schizophrenia but had a history of non-compliance with her medication. She also had a history of failing to keep medical appointments to assess and treat Gil's clubbed feet.

When the Division received the referral, Wendy was residing in a two-bedroom apartment provided to her through the "Open Doors program by Advantage Mental Healthcare Services." Open Doors provided Wendy with rental assistance and linked her with other Social Services for food assistance. The Division had Wendy undergo evaluation by a psychologist who was a Division consultant. The psychologist recommended that the Division continue to monitor Wendy's mental health, offer her support related to parenting, and have Wendy engage in a partial care program so that Wendy's health needs could be appropriately monitored. The psychologist also recommended that Wendy undergo individual and group therapy. Last, the psychologist recommended the

---

[2] Wendy did not know where Gil's putative father, who had allegedly raped Wendy, lived. He was not located during the proceedings. His parental rights were terminated.

A-0236-18T1

Division help Wendy with vocational training to give her a sense of independence.

The Division implemented a safety protection plan. Gil was placed in daycare from 8:30 in the morning to 5:00 in the afternoon, and a homemaker came to Wendy's home in the evening to assist her with feeding and bathing the child and preparing for the next day. The plan required Wendy to take her prescribed psychiatric medication on time, comply with services for Families First, comply with the in-home homemaker services on weekends, and comply with the daily daycare program. In addition to the services provided by the Division, Wendy's mother assisted Wendy with caring for Gil.

Notwithstanding the considerable support Wendy received from the array of services the Division provided, Wendy had difficulty keeping her appointments and sometimes did not maintain her scheduled medications. In February 2016, Wendy's older brother began to visit her. Wendy claimed that her brother had molested her and physically assaulted her when she was a young child. Nonetheless, the brother told a Division worker he was there "mostly every day to keep her company and help out."

Wendy was having difficulty keeping track of her medications. For some, she took less than the prescribed dosage. For one, she took more than the

prescribed dosage. Her home was "untidy, with toys strewn about the living room." The caseworkers, however, were not initially concerned for Gil's safety, given the array of services Wendy was receiving. They grew concerned when Wendy told them she was "'overwhelmed'" with her son "as he did not take naps and often made it difficult for her because she was tired."

In March 2016, the Division received the report of Wendy's psychological evaluation. The psychologist reported that Wendy's "insight into her psychological functioning and that of others was limited." The psychologist opined that Wendy's "presentation could be characterized by a presence of schizoaffective disorders which impacted her functioning." Concerning Wendy's ability to parent Gil, the psychologist explained that she was able to care for the child's basic needs with appropriate guidance, but due to her mental health, she might need support in place throughout her life to properly parent Gil.

As previously noted, in April 2016 the Division filed a Title 30 complaint for care and supervision of Gil. Between the filing of that action in April 2015, and the Division's filing of the guardianship complaint in September 2017, Wendy's condition remained about the same. The Division continued to provide an array of services to Wendy, including home support services. The Division

was unable, however, to locate an agency that would provide twenty-four hour supervision and long term care for her. Personnel from the services that were assisting Wendy started to express concern about the condition of her home. For example, one service expressed concern about Wendy not cleaning food from plates and leaving old food around the house.

In September 2016, Gil's daycare reported that his sippy cup had mold on it and a few weeks earlier his lunch bag smelled of spoiled milk. Also in September, workers who visited Wendy's apartment noted a smell of urine, the baby gate to the stairs removed, and fecal stains on the floor and pillows in two rooms. Gil had dried feces on his leg and thigh. Wendy admitted that Gil had suffered from diarrhea since early August but she had yet to take him to the pediatrician. While the worker was present, Gil ripped off his diaper and urinated on the carpet. Wendy told the worker she had forgotten to take her anti-depressant for two days.

On the same day, September 7, 2016, the Division removed Gil from Wendy's care. Gil was placed with an aunt and uncle. Within a few weeks, Gil's aunt and uncle reported that the child was too much for them. Gil was placed with his maternal grandparents, a situation that accommodated Wendy's liberal visitation with Gil.

A-0236-18T1

From September 2016 when Gil was removed, until September 2017 when the Division filed the guardianship complaint, the Division continued to provide services to Wendy. The Division implemented a Children's Aid and Family Services Therapeutic Supervised Visitation Program so that Wendy could be observed with Gil in a therapeutic setting, and the personnel involved could provide Wendy with parenting tips, redirection, if necessary, and continued bonding efforts. Due to concerns about the conditions in Wendy's home, the Division provided her with a cleaning service to assist and provide Wendy with guidance on how to clean dishes, clothing, the home, floors, and furniture. The Division also arranged for Wendy to undergo psychological evaluations. Wendy received therapeutic services, medication management, and monitoring.

In addition, Wendy continued in the "Mentoring Moms" program, which provided her with a mentor who had an understanding of her needs and who would meet with Wendy periodically. Unfortunately, the mentor's visits with Wendy ended after the mentor had to cancel appointments in December 2016 and January 2017 due to a family crisis and the program was unable to reach Wendy by telephone.

From November 2016 through March 2017, Children's Aid and Family Services documented that though a loving and caring person, very engaged with

Gil and receptive to redirection and feedback during her sessions, Wendy had difficulty identifying and addressing her son's emotional and physical cues. The services provided by the organization ended when its personnel felt they could no longer assist Wendy.

The Division had recommended a psychological examination due to concern that Wendy was not receptive to Gil's verbal cues and to get a sense of Wendy's cognitive ability. After receiving the results of the psychological evaluation, the Division did not seek to reunify Wendy and Gil. The psychologist recommended that Wendy continue with her medication management, counseling, and family support. In June 2017, Wendy was also provided with services through a visiting, counseling, and reunification program. Her participation ended when the Division's case plan and goal changed from reunification to placement with a relative and adoption. The change occurred on August 8, 2017. On August 21, 2017, Gil was placed with Wendy's cousins, who resided in Florida. The cousins were referred by Gil's grandparents.

Gil has remained in his placement home in Florida continuously since August 21, 2017. Nonetheless, the Division continued to monitor services to Wendy, especially the mental health services. When a Division adoption worker

was assigned to the case, the worker continued to address the Division's concerns that Wendy lacked insight into her mental health diagnosis. The Division continually encouraged Wendy to work on the issue due to its impact on her ability to parent Gil.

In October 2017, a partial care or hospitalization program Wendy had attended for more than a year reported that she had presented as disorganized and exhibiting delusional thinking. Program personnel began injecting one of her medications. The injected dosage lasted approximately one month.

After Gil moved to Florida to stay with his relatives, the Division continued to arrange monthly visits for Wendy. The Division paid for her flights to Florida and her hotel accommodations. Two workers traveled with her to supervise.

The Division's adoption worker visited Gil's caretakers in Florida in November 2017. The worker observed that the resource mother was able to redirect Gil's attention and have him obey her. The resource mother was firm with Gil and he responded to her directions. In addition, the resource parents were able to obtain services for Gil. According to the adoption worker, the resource parents appeared to be equipped and capable to meet Gil's needs. The resource parents expressed their commitment to adopting Gil and providing him

with long-term care. They were uninterested in kinship legal guardianship. The Division agreed that adoption was in Gil's best interest.

Dr. Frank Dyer, the Division's expert in psychology and bonding, conducted a psychological evaluation of Wendy, a bonding evaluation of Wendy and Gil, and a bonding evaluation of the resource parents and Gil. Based on his review of Wendy's medical and other records, his psychological testing of Wendy, and his psychological evaluation of her, he concluded Wendy was "substantially lacking in parenting capacity."

Dr. Dyer explained that Wendy lacked insight into her psychiatric condition, as evidenced by her permitting her brother—who had molested her when she was a child—to assist her in caring for Gil, and her belief Gil was removed because of one incident of defecating on the floor. The doctor also cited "the child's defiance, [Wendy's] incompetence in controlling him and the fact that the home had been observed to be in a really unhygienic condition with feces on the floor, repeatedly." According to Dr. Dyer, Wendy minimized Gil's behavioral problems. The doctor's real concern was that Wendy's experience of failing to control Gil would precipitate a regression in her psychiatric status.

The doctor noted Wendy had progressed from a state of complete psychological disorganization to her present stabilized state, which he

considered a "real achievement."   He was concerned, however, that Wendy's resuming the responsibility of caring for Gil would cause her to experience many negative feelings, such as anger and frustration, which would in turn cause her to destabilize.   Wendy did not have any appreciation of the depths, psychologically speaking, to which she could regress.   She also did not comprehend the kinds of challenges Gil could present, such as "defiance, disobedience, having very severe emotional reaction to frustration, being disrespectful and dismissive of the parents' instructions and commands and requests."

Dr. Dyer also predicted "with a high degree of confidence that if [Gil] were disrupted from his present caretakers, who are doing a good job with him, then he would demonstrate a very severe regression in his emotional adjustment and particularly in his behavior."   In short, "the situation would revert to the situation that was in effect at the time of the child's removal."   The doctor emphasized that Gil requires a structured environment where he knows what to expect, what the rules are, and knows the consequence of failing to conform to expectations.   The child needs a stimulating environment with opportunities "to engage in learning experiences, to engage with a parent, to orient the child as to

what to expect from other people, from the child's peers, to provide some continuity with the child's history."

Dr. Dyer explained that for someone such as Wendy who suffered from schizoaffective disorder, which includes bipolar disorder and schizophrenia, the underlying disease process is always present. If the afflicted individual is in a sufficiently stable, rewarding, and stress-free environment, regression is unlikely. In Dr. Dyer's opinion, Wendy was in such an environment—she had moved into a group home—which explained her stability. If, however, the responsibility for raising a child is added, the likelihood is Wendy will relapse.

Concerning the doctor's bonding assessments, his overall impression was that Gil had a positive emotional connection to his mother, Wendy. However, the child also was very comfortable with the resource parents and was developing an attachment to them. Dr. Dyer found that Gil looked to them for structure, stimulation, and guidance. In fact, Gil had made significant strides in behavioral improvement since being placed with his resource parents.

Dr. Dyer opined that Gil's stability and improvement had resulted from his caretakers providing him with a structured and appropriate parental environment in which Gil was flourishing. The doctor also explained that Gil had become dependent on his resource parents. The doctor had every

13

expectation that the attachment Gil had formed with his resource parents "would grow and deepen the longer he stays there."

On the other hand, if Gil were removed from his resource parents, "it would be as though a major part of his inner emotional world had dropped out from under him. And we would have a very distressed and disorganized child."

Dr. Dyer believed that being out of Wendy's care for a substantial time during his childhood would likely cause Gil to experience some sort of loss, because Gil likes his mother and enjoys seeing her. Nevertheless, the loss would not, in the doctor's opinion, rise to the level of some sort of serious psychological impact or long term negative impact on Gil's psychological growth and development.

Moreover, the doctor had no concerns whatsoever as to the ability of the resource parents "to mitigate whatever negative effects might be associated with the severing of a relationship with [Gil's] mother." The doctor had "every confidence in their responding appropriately in meeting this child's special needs, going forward." In view of Wendy's negative prognosis concerning parenting capacity, the doctor was of the opinion that Gil should not be deprived of permanency. On the contrary, the doctor believed "there is an urgency for this child to have a set of adults or an adult to whom he can turn for comforting

14

in times of distress, for protection in times of perceived danger, and whom he can proceed as the individual or individuals who are entrusted with absolute ultimate parental authority and responsibility for him."

Samiris Sostre, M.D., the Division's expert in psychiatry, agreed with Dr. Dyer's conclusions. Based on her evaluation of Wendy and her review of Wendy's records, she diagnosed Wendy with schizoaffective disorder, that is, a combination of schizophrenia and bipolar disorders. She noted Wendy's history of symptoms that included disorganized thinking, delusions, disorganized behaviors, and agitation, and she added that Wendy had provided a history of depressive episodes in the past.

Although Dr. Sostre thought Wendy was doing well when she evaluated her, Wendy's schizophrenia prevented her from recognizing Gil's emotional needs. Because Wendy did not have the ability to respond to her child, emotionally, and because there was nothing that could be done to correct that problem, Wendy's ability to parent was in turn affected.

Dr. Sostre concluded that due to Wendy's psychiatric condition, a deficit in her cognitive skills that made it difficult for her to develop new skills, and the absence of treatment to minimize her psychiatric illness, Wendy was not able to independently parent Gil in the future.

A-0236-18T1

Wendy presented two witnesses at trial: her father and an expert in psychiatry. Her father testified that after Gil was removed from her care, Wendy became more focused, not as tired, and "much more like a normal person would be." He felt Wendy was doing much better, since now she had a nice routine taking "three buses every day to Ridgewood for groups" and getting help. Wendy's father also believed Wendy was a good mother and deserved another chance, suggesting that her medication at the time of removal was incorrect, and negatively impacted her ability to parent.

The psychiatrist Wendy presented, Doctor Howard E. Gilman, held an opinion that differed from that of the Division's experts. Dr. Gilman conducted evaluations of Wendy in December 2016 and March 2018 and reviewed her records. According to him, Wendy's records revealed she had been free of acute psychotic symptoms for close to eight years. Although he diagnosed her with borderline personality disorder, he found it notable that in recent years "there was something going on in her treatment that was helping her to have her symptoms under better control than she had previously."

Dr. Gilman explained that during her later evaluation, Wendy was calm, engaging, pleasant, and had "good judgment and insight, in the sense that she understood that she needed treatment, and she was able to follow that treatment."

A-0236-18T1

In contrast, during the 2016 evaluation he found Wendy unstable and predicted "a poor course." Thus, Wendy had improved since 2016, now understood that she was ill, welcomed treatment, and complied with her medications.

Dr. Gilman disagreed with Dr. Sostre's diagnosis of schizoaffective disorder. In the course of his evaluation, Dr. Gilman did not notice "any ongoing or chronic symptoms of psychosis, that [he] would expect to see in someone with schizoaffective disorder." He reiterated that Wendy continued to work with a treatment team and recognized the need for help, which would lead to a better prognosis. Dr. Gilman ultimately opined that Wendy was currently stable, and her psychiatric condition did not preclude her from parenting or raising Gil.

In a thorough, thoughtful, and comprehensive written decision, Judge Darren T. DiBiasi determined the Division had clearly and convincingly proved that termination of Wendy's parental rights was in Gil's best interest. Judge DiBiasi found that Gil's safety, health and development were in danger at the time of removal and continued to be in danger due to Wendy's failure to obtain parental capacity. The judge found that despite Wendy's strong love for Gil, she was unable to safely parent him due to her unresolved mental health issues, which caused lapses in her parental judgment that threatened Gil. The judge

found credible the testimony of the Division's experts that Wendy did not fully grasp the extent to which her problems could be harmful to Gil.

In addition to the unhealthy and unsafe conditions Division workers found when they visited Wendy's home, the judge noted Wendy's inability to sense Gil's basic needs, for example, when he was cold. The judge found that Wendy was incapable of maintaining her own medication schedule.

Judge DiBiasi found credible the testimony of Drs. Dyer and Sostre that emphasized Wendy's need for ongoing supervision and guidance. As the judge pointed out, even Dr. Gilman emphasized that Wendy must remain in treatment and comply with recommendations of her treatment team. Although Dr. Gilman opined that Wendy's mental illness alone did not preclude her from parenting Gil, he acknowledged Wendy's condition could create a potentially dangerous environment for her son.

Next, Judge DiBiasi determined Wendy was unable to eliminate the risk she posed to her child and was unable to provide a safe and stable home for Gil. The judge detailed the overwhelming evidence presented by the Division on this issue. In addition, the judge noted that the young child's behavioral issues and specific needs required extra patience, attention, and frustration tolerance. Wendy, however, demonstrated ongoing difficulty with organizing, imputing,

and processing information. Her illness and its consequences made it nearly impossible for Wendy to parent properly.

Moreover, despite medication and compliance with the Division's recommendations, Wendy's "deficits will always exist and are untreatable, even with extensive therapy." Once again, the court found Dr. Sostre's opinion credible and noted that Dr. Gilman acknowledged Wendy "requires ongoing permanent treatment regardless of her diagnosis." The judge also cited Dr. Gilman's acknowledgment that Wendy would likely be negatively affected by stressors and that her condition had a potential to create a dangerous environment for Gil. Judge DiBiasi agreed with the Division's experts that Wendy's persistent, disruptive, and severe symptoms prevented her from effectively parenting Gil. In short, the judge found that Wendy was unable to eliminate the harm she posed to Gil.

Judge DiBiasi found the Division had made reasonable efforts to provide services to help Wendy correct the circumstances that led to Gil's placement. Last, Judge DiBiasi found the Division had clearly and convincingly proven that terminating Wendy's parental rights would not do more harm than good. In that regard, the judge found credible Dr. Dyer's testimony concerning the bonding of Gil with his resource parents, as well as Dr. Dyer's opinion that terminating

Wendy's parental rights would cause no lasting harm to Gil. Judge DiBiasi clearly recognized that Wendy loved Gil. However, after carefully considering all the evidence, the judge concluded the Division had clearly and convincingly proven that terminating Wendy's parental rights was in Gil's best interests.

We must consider the judge's decision in light of well-established legal principles that guide our review. Parents have a constitutionally protected, fundamental liberty interest in the care, custody, and supervision of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007). Nonetheless, that interest is not absolute and "must be balanced against the State's parens patriae responsibility to protect the welfare of children." N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007) (internal citations omitted) (quoting M.M., 189 N.J. at 294-95). In some cases, termination of a parent's constitutionally protected interest may be necessary to protect a child. N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986).

The Division is "the State agency for the care, custody, guardianship, maintenance and protection of children." State ex rel. J.S., 202 N.J. 465, 477 (2010) (quoting N.J.S.A. 30:4C-2(a)). When the Division seeks to terminate a person's parental rights, a court must determine if doing so is in the child's or

children's best interests.  The "best interests" standard is codified in N.J.S.A. 30:4C-15.1(a), which requires the Division prove by clear and convincing evidence:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. . . . ;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11.

Family courts deciding the profound issues involving the welfare of children have special expertise and their fact finding is entitled to deference by appellate courts.  Cesare v. Cesare, 154 N.J. 394, 413 (1998).  For that reason, we will not disturb a Family Part judge's findings of fact unless "convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of

21

justice." Id. at 412 (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). We owe no deference, however, to "[a] trial court's interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

After considering Wendy's arguments in light of the record developed during the guardianship trial, controlling legal principles, and our standard of review, we affirm the guardianship judgment, substantially for the reasons expressed by Judge DiBiasi. This is a difficult case. Indisputably, Wendy loves her son and wants to care for him. Gil, in turn, has an attachment to his mother. But our role is not to retry the case, reassess the parties' proofs, or substitute our judgment for that of the trial court. In these difficult cases, the ultimate decision whether to terminate parental rights is placed in the first instance—as it should be—with those judges with special expertise in such matters who have had the opportunity to assess firsthand an extensive body of proof and often conflicting expert opinions.

That is precisely what took place in this case. Judge DiBiasi's sensitive but comprehensive factfinding and credibility determinations and his resolution of the profound issues that confronted him in this case are amply supported by

credible evidence on the record. Wendy's arguments, though understandable, are based on her view of the evidence, which is not consistent with our standard of review. Judge DiBiasi's decision is anything but one we would disturb as so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0236-18T1